UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| MARIA CIRINO | * | CIVIL NO. 25-1097 (GMM) |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | |
| | * | |
| KENNETH J. HORGAN and KEVIN | * | |
| SCOTT BENTE; | * | |
| | * | |
| Defendants. | * | |
| _____ | * | |

**ANSWER TO THE COMPLAINT AND COUNTERCLAIMS**

TO THE HONORABLE COURT:

NOW COME Defendants, KENNETH J. HORGAN and KEVIN SCOTT BENTE, through their undersigned attorneys, and respectfully set for their Answer to the Complaint and Counterclaim:

## I.    INTRODUCTION

Defendants deny as drafted the allegations contained in the section titled INTRODUCTION of the Complaint. Defendants affirmatively allege that the $125,000 loan was not delinquent when discussions between the parties regarding the $200,000 advance and $20,000 loan were initiated. Defendants further affirmatively allege that the bank did not initiate or inform the Defendants that it was planning to initiate foreclosure proceedings. Defendants also affirmatively allege that Plaintiff approached Defendant Horgan to suggest that they list the property to test the market, to which they both agreed.  Defendants affirmatively allege further that they agreed to allow Cirino the right to market, price, and negotiate selling terms with prospective buyers, but absolutely not to approve an actual acceptance of an offer.

1

**II. JURISDICTION AND VENUE**

1.      The allegations of paragraph 1 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the allegation about a foreclosure action was confirmed to be false by the Seamen's Bank Vice President for Lending. No such default or foreclosure action occurred. Furthermore, the cases cited by Plaintiff, *Autoridad de Energia Electrica de P.R. v. Ericsson, Inc.*, 201 F.3d 15(1st Cir.), and *Clair Aero, Inc., et al. v. Tradewinds Mutual Ins., LLC*, 491 F. Supp. 2d 211 (D.P.R. 2007), are inapposite and do not control in this case.

**III. THE PARTIES**

2.      The allegations of paragraph 2 of the Complaint are hereby denied for lack of information or belief to form an opinion as to their veracity.

3.      The allegations of paragraph 3 of the Complaint are hereby admitted.

4.      The allegations of paragraph 4 of the Complaint are hereby denied.

**IV. "FACTS"**

5.      The allegations of paragraph 5 of the Complaint are hereby denied as drafted. Defendants hereby affirmatively allege that the terms, conditions, and obligations of the Purchase and Sale Agreement and the Asset Purchase and Sale Agreement have a self-explanatory meaning, value, or implication for the transactions documented in them.

6.      The allegations of paragraph 6 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Plaintiff, Defendants, and Elizabeth Barbeau entered into a Partnership Agreement where each party agreed to have 25% of ownership interests, share of costs, and profits. Defendants further affirmatively allege that the Partnership Agreement has a self-explanatory meaning, value, or implication for the transactions documented in them.

7.      The allegations of paragraph 7 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Plaintiff and Elizabeth Barbeau had no role in the operation and management of the hotel and the property, except for those occasions in which Plaintiff insinuated herself into performing certain acts on her own without consultation with the Defendants that allowed her to extract revenue and wealth from the operation of the hotel.

8.      The allegations of paragraph 8 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Plaintiff's involvement with the business was only to extract value, cash, resources, or for immediate personal enrichment.

9.      The allegations of paragraph 9 of the Complaint are hereby denied. Defendants affirmatively allege that the project began in 2018 with the petition and eventual granting of a Massachusetts Economic Development Project Waiver. The use and management of water resources in this region of Massachusetts is particularly sensitive. The planning, approval, and development process was extensive and called for the petition and eventual granting of an Economic Development Project Waiver. The Economic Development Approval for the project would only be possible with the FLEXING of Pilgrim House assigned gallons of water use ("Gallons") from the building owned by the initial four partners to the building owned by Cirino. The allotted flow of water of the Pilgrim House property is a valuable asset and was transferred to allow the project to proceed. These Gallons of water were registered with the Barnstable County Courthouse on record as "FLEX" gallons owned by Pilgrim House LLC and were to revert to the Pilgrim House parcel if either of the properties had any change in ownership. The value of these gallons has been calculated at over $275,000 and would not have been otherwise available to Plaintiff for this project. Defendants further affirmatively allege that the total cost of the project described by Plaintiff as a retrofit of Plaintiff's building exceeded the $250,000 loan that was

3

funded to a person by the name of Lyn Plummer. Finally, Plaintiff has never submitted to Defendants an itemized list of expenses that Defendants were forced to pay for this project. Finally, upon information and belief, documents prepared and presented to Defendants by Lyn Plummer (Lease Agreements), did not reflect the truth of the transactions that they intended to document. Upon information and belief, they were created upon the suggestion of a Loan Officer from Eastern Bank, the issuer of the $250,000 loan. In any event, the loan has been paid back in accordance with the agreement.

10. The allegations of paragraph 10 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Co-Defendant Bente was not party to the Promissory Note, did not sign it, and was not part of the discussion.

11. The allegations of paragraph 11 of the Complaint are hereby denied. Defendants affirmatively allege that 336 Commercial Street LLC was not a party to this loan. In addition, there was no delinquency to this loan.

12. The allegations of paragraph 12 of the Complaint are hereby denied. Defendants affirmatively allege as of February 2023, at the time of the second loan discussion, there was no lawsuit or any plans to end the venture in short order. Furthermore, Defendants refused the offer of a loan based on terms that included turning over any interest in their common ventures. Moreover, Defendants further affirmatively allege that the Agreement Among Maria Cirino, Kenneth Horgan, and Scott Bente dated February 27, 2023 has a self-explanatory meaning, value, or implication for the transactions documented in them.

13. The allegations of paragraph 13 of the Complaint are hereby denied as drafted. Defendants further affirmatively allege that the Agreement Among Maria Cirino, Kenneth Horgan, and Scott Bente dated February 27, 2023 has a self-explanatory meaning, value, or implication for

4

the transactions documented in them.  Defendants affirmatively allege further that they never agreed to empower Plaintiff to unilaterally execute a sale out of her own volition.

14.    The allegations of paragraph 14 of the Complaint are hereby denied as drafted. Defendants further affirmatively allege that the Agreement Among Maria Cirino, Kenneth Horgan, and Scott Bente dated February 27, 2023 has a self-explanatory meaning, value, or implication for the transactions documented in them.  Defendants further affirmatively allege that Pilgrim House was not a party to the agreement that Plaintiff refers as the "Advancement Agreement."

15.    The allegations of paragraph 15 of the Complaint are hereby denied as drafted. Defendants further affirmatively allege that the Agreement Among Maria Cirino, Kenneth Horgan, and Scott Bente dated February 27, 2023 has a self-explanatory meaning, value, or implication for the transactions documented in it.  Defendants further affirmatively allege that the parties understood that the full obligation of the loan was resolved with the transfer of Employee Retention Tax Credit ("ERTC") money without any further mention or attempt to collect on the loan before January 2025.

16.    The allegations of paragraph 16 of the Complaint are hereby admitted. The deposit was made on July 6, 2024.

17.    The allegations of paragraph 17 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the ERTC payment was agreed to be based on the NET proceeds, not from the GROSS proceeds of the ERTC, as the preparation and filing of the request for the ERTC involved costs from the accounting firm that prepared and filed it.

18.    The allegations of paragraph 18 of the Complaint are hereby denied. Defendants affirmatively allege that there was never a representation of such a series of defaults, or any formal or other type of demand.

19.    The allegations of paragraph 19 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the Agreement Among Maria Cirino, Kenneth Horgan, and Scott Bente dated February 27, 2023 has a self-explanatory meaning, value, or implication for the transactions documented in them.

20.    The allegations of paragraph 20 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the Agreement Among Maria Cirino, Kenneth Horgan, and Scott Bente dated February 27, 2023 has a self-explanatory meaning, value, or implication for the transactions documented in them.

21.    The allegations of paragraph 21 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the Agreement Among Maria Cirino, Kenneth Horgan, and Scott Bente dated February 27, 2023 has a self-explanatory meaning, value, or implication for the transactions documented in them.

22.    The allegations of paragraph 22 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that by forwarding the net proceeds of the ERTC to Plaintiff they had met their obligation. They received no objection or claim from Plaintiff until much later, in January of 2025.

23.    The allegations of paragraph 23 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the discussions between the parties revolved around the inflated market prices of other properties in the area. The parties then discussed whether Pilgrim House could receive a similarly inflated purchase offer and, if so, whether there would be value to place the business and the property on the market to confirm the interest there may be. These discussions were radically different from Plaintiff's forceful pressure and suggestion that Defendants accept a lower valued offer to purchase the business and the property.

24.    The allegations of paragraph 24 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Defendant Horgan did not hire a realtor. Plaintiff contacted a realtor to reach out to Defendant Horgan with the understanding that the purpose was to determine whether a lucrative offer might be made that would lead all parties to agree to sell the business and property before the end of the ten-year period contemplated in the Agreement Among Maria Cirino, Kenneth Horgan, and Scott Bente dated February 27, 2023

25.    The allegations of paragraph 25 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Seamen's bank never communicated an intent to initiate a foreclosure action to Defendants or initiated one. The bank was working with Defendant Horgan to work through the cash flow challenge, which was impacted by the steep increase in the variable interest rate on the purchase loan as well as other factors.

26.    The allegations of paragraph 26 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that tax filings were delayed and complicated by Plaintiff's demand to change accounting firms and bookkeeping firms on more than one occasion. Extensions to file returns were granted for these years as the new firms worked on reconciling the books to prepare the returns. The returns have been filed as of this date.

27.    The allegations of paragraph 27 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Defendants' returns were submitted to the bank and the interest rate has been adjusted.

28.    The allegations of paragraph 28 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the payment of taxes was impacted by the cash flow challenges. Defendant Horgan signed a Power of Attorney for Plaintiff's chosen representative to negotiate and agree upon payment terms of these taxes with the State of Massachusetts Tax

7

Examiner (Examiner Wray). Plaintiff's chosen representative did not follow up and allowed these taxes to default. Defendant Horgan stepped in and has worked directly with Examiner Wray to rectify the delinquent tax situation. These taxes have been paid as of this date. The state Examiner has verified to Defendant Horgan that Plaintiff's alleged "tax refund" was not applied to any of Pilgrim House's obligations. Due to confidentiality laws, he could not discuss any further with regard to Plaintiff's personal transaction information.

29.    The allegations of paragraph 29 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the cash flow challenge, which was impacted by the steep increase in the variable interest rate on the purchase loan and other factors required Pilgrim House to pay some obligations using credit cards. As of this date, the balance of the credit card accounts has been paid down significantly as of this date. Defendant Horgan informed Plaintiff in numerous conversations regarding these topics, not because Plaintiff discovered them, but because the information was expressly shared with her.

30.    The allegations of paragraph 30 of the Complaint are hereby denied.

31.    The allegations of paragraph 31 of the Complaint are hereby denied. Defendants affirmatively allege that Plaintiff made this suggestion to Defendant Horgan but he never agreed to the request. Furthermore, Defendant Horgan shared Plaintiff's suggestion with Defendant Bente that the request was mad, but Defendant Bente never agreed to such a request either.

32.    The allegations of paragraph 32 of the Complaint are hereby denied. Defendants affirmatively allege that Defendant Horgan met with Plaintiff to review all transactions between Pilgrim House and Zoso Operations LLC. After the extensive review, Plaintiff and Defendant Horgan agreed upon a sum that Zoso Operations LLC was to submit to Pilgrim House LLC. The funds were indeed transferred to Pilgrim House LLC. All transactions were tagged "due to" and

"due from;" there was no hiding of any transactions. Plaintiff's representatives within the bookkeeping firm of Plaintiff's selection have and have always had 100% access to all banking and loan accounts at Seamen's Bank.

33.    The allegations of paragraph 33 of the Complaint are hereby denied for lack of information or belief on which to form an opinion as to their veracity.

34.    The allegations of paragraph 34 of the Complaint are hereby denied for lack of information or belief on which to form an opinion as to their veracity.

35.    The allegations of paragraph 35 of the Complaint are hereby denied. Defendants affirmatively allege that any payments to any personal credit card account were to cover charges that were designated to relate to Pilgrim House LLC.

36.    The allegations of paragraph 36 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Defendant Horgan met with Plaintiff and reviewed transactions and funds were transferred to Pilgrim House LLC based on their mutual agreement.

37.    The allegations of paragraph 37 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that they have paid the minimum annual disbursements to Plaintiff and Barbeau. The payments corresponding to 2020 and 2021 were frozen due to the COVID pandemic. Plaintiff agreed and requested that funds instead be used to pay full rent of the front building units (owned exclusively by Plaintiff) despite a statewide emergency rent suspension order. The amount Plaintiff claims has not been paid is in question. Any payments in arrears can be met at the time of a sale or at the 10-year buyout provision timetable.

38.    The allegations of paragraph 38 of the Complaint are hereby denied for lack of information or belief to form an opinion as to their veracity. Defendants affirmatively allege that

9

any tax obligations are being met and Defendant Horgan has been working with the state examiner. Although Defendant Horgan did not receive any such letter, he supplied Power of Attorney to the WA Leonard CPA firm when he was asked by Plaintiff so they could negotiate and set forth a payment structure for the taxes due at the time Barbeau received the letter. Since then, Horgan has stepped in and satisfied all tax obligations.

39. The allegations of paragraph 39 of the Complaint are hereby denied. Defendants affirmatively allege that Plaintiff and/or her representatives have access to all systems, accounts, information and relevant data, and have had it since 2017.

40. The allegations of paragraph 40 of the Complaint are hereby denied for lack of information or belief to form an opinion as to their veracity. Defendants affirmatively allege that, although several requests were made to Plaintiff she never presented or produced a copy of any "Offer to Purchase Agreement" was never presented to Horgan. Plaintiff told Defendant Horgan that she had negotiated leases in her front building with prospective buyers, but Defendants never received from her any Bonafide Offer to Purchase Agreement to review.

41. The allegations of paragraph 41 of the Complaint are hereby denied for lack of information or belief to form an opinion as to their veracity. Defendants affirmatively allege that, one year ago, an offer higher than $4.5 million was made to purchase the business and the property and Plaintiff called it "insulting". This offer allegedly received by Plaintiff does not reflect the value of the property and the business. The dollars per square foot representation that was used corresponded to residential transactions. As of this date, Pilgrim House has no outstanding tax obligations or any delinquent credit accounts. Plaintiff is the only 'creditor" claiming to be owed, and she wishes to close on the sale based on the offer she allegedly received mainly because she will continue to benefit from the leases in the front building that she claims to have negotiated.

10

42.     The allegations of paragraph 42 of the Complaint are hereby denied. Defendants affirmatively allege that Plaintiff or Plaintiff's representatives have full access to all systems, accounts, information and relevant data.

43.     The allegations of paragraph 43 of the Complaint are hereby denied as drafted.

44.     The allegations of paragraph 44 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that they did not sign the documents sent. The Demand Letters were based on erroneous conclusions and false accusations.

45.     The allegations of paragraph 45 of the Complaint are hereby denied. Defendants affirmatively allege that Defendant Horgan is actively working to maximize the 2025 Summer season business. As Managing Partner, that is his fiduciary duty. Upon information and belief, Plaintiff has reached out to contracted performers and told them that Defendant Horgan has no authority to manage the Pilgrim House Hotel and is unethical. The performers all withdrew from their initial commitment to perform at Pilgrim House. With no "Offer to Purchase Agreement" presented to Defendant Horgan and a sales price shared that is not acceptable to Defendants, Horgan's duty is to continue to prepare Pilgrim House LLC for the 2025 Summer earning season, not to submit to Plaintiff's authoritarian tendencies. Upon information and belief, Defendants further assert that Plaintiff's comments to entertainers painting Horgan as an embezzler, a criminal, and a person soon to be serving jail time have damaged his reputation. Plaintiff is actively attempting to deny Pilgrim House LLC from conducting business in 2025.

46.     The allegations of paragraph 46 of the Complaint are hereby denied. Defendants affirmatively allege that there was no such verbal contract with either of the Defendants.

47.     The allegations of paragraph 47 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Defendants have communicated what the net proceeds of a

11

sale of the business and property would require in response to the alleged offer that Plaintiff has received to purchase the business and property. Defendants further affirmatively allege that, if anything is improper, it is that Plaintiff is willing to accept an undervalued offer as long as she continues to extract revenue from the hotel due to her ownership of the front building.

48.     The allegations of paragraph 48 of the Complaint are hereby denied as drafted. See response to paragraph 47.

49.     The allegations of paragraph 49 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Exhibit 4 to the Complaint dated February 5, 2025 has a self-explanatory meaning, value, or implication

50.     The allegations of paragraph 50 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Plaintiff's repeated attempt at intimidation of the Defendants belie her true intentions behind the filing of this lawsuit.

51.     The allegations of paragraph 51 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Defendant Horgan is and has been the Operating Manager of the entity and the hotel itself and, for the past 7 years, Horgan has signed all contracts with performers, contractors and managers. In his role as such, Defendant Horgan has managed all human resources, has set hotel room rates and employee compensation packages, has made all purchase decisions of technology, equipment, furniture, fixtures and supplies, has made all maintenance and repair spending decisions, and has made all marketing strategies and spending decisions. All these duties were executed without any need for any involvement or approval of Plaintiff, who in her role as a passive (and now predatory) investor would not even begin to know how to perform all those duties.

52.    The allegations of paragraph 52 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Defendants have done nothing to hinder Plaintiff from listing, marketing, negotiating, and present any credible and reasonable offer to purchase the business and property. Furthermore, Defendants owe no duty to Plaintiff to accept sale price that is undervalued.

53.    The allegations of paragraph 53 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the obligations listed by Plaintiff are being met with the operating income of the entity. Defendants believe the mentioned potential sale that Plaintiff is attempting to cram upon them is designed to cause financial harm to Defendants as a vindictive act in breach of her own fiduciary duties of loyalty, candor, and judgment to the Pilgrim House.

## V. CAUSES OF ACTION

### First Cause of Action: Breach of Contract

54.    Defendants reallege and incorporate by reference each and every response to the allegations above as if fully set forth herein.

55.    The allegations contained in paragraph 55 of the Complaint are conclusions of law that do not require a response from Defendants at this time.

56.    The allegations contained in paragraph 56 of the Complaint are conclusions of law that do not require a response from Defendants at this time.

57.    The allegations contained in paragraph 57 of the Complaint are conclusions of law that do not require a response from Defendants at this time.

58.    The allegations of paragraph 58 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that they did request additional investment from Plaintiff but not because they were in default of the first loan.

59. The allegations of paragraph 59 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the $250,000 loan for the renovations made to Plaintiff's and Barbeau's front building was not with Defendants or Pilgrim House LLC.

60. The allegations of paragraph 60 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the Agreement Among Maria Cirino, Kenneth Horgan, and Scott Bente dated February 27, 2023 has a self-explanatory meaning, value, or implication for the transactions documented in them.

61. The allegations of paragraph 61 of the Complaint are hereby admitted.

62. The allegations of paragraph 62 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that the Agreement Among Maria Cirino, Kenneth Horgan, and Scott Bente dated February 27, 2023 has a self-explanatory meaning, value, or implication for the transactions documented in them. The agreement does not stipulate that Defendants must agree to just any offer that results from Plaintiff's right to the listing of the business (value, timing, and strategy). Plaintiff's contractual authority does not extend to forcing Defendants into accepting just any offer.

63. The allegations of paragraph 63 of the Complaint are hereby denied as drafted. Defendants affirmatively allege that Plaintiff's portrayal of herself as a savior investor who has been wronged is belied by the facts that she demanded to be repaid with the net proceeds of the ERTC distribution to Pilgrim House LLC, transferring to her entity and property the allotment of gallons of water that the Pilgrim House was already entitled to, forcing Pilgrim House to defray the cost of the renovations to her front building, and demanding the payment of rent of those units during the pandemic when the State of Massachusetts had declared a freeze on the payment of rent and business in the hotel had significantly been reduced.

14

.    64.    The allegations of paragraph 64 of the Complaint are hereby denied.

65.    The allegations of paragraph 65 of the Complaint are hereby denied.

66.    The allegations contained in paragraph 66 of the Complaint are conclusions of law that do not require a response from Defendants at this time.

67.    The allegations of paragraph 67 of the Complaint are hereby denied.

68.    The allegations of paragraph 68 of the Complaint are hereby denied.

69.    The allegations of paragraph 69 of the Complaint are hereby denied.

70.    The allegations of paragraph 70 of the Complaint are hereby denied for lack of information or belief to form an opinion as to their veracity.

71.    The allegations of paragraph 71 of the Complaint are hereby denied.

**Second Cause of Action: Declaratory Judgment**

72.    Defendants reallege and incorporate by reference each and every response to the allegations above as if fully set forth herein.

73.    The allegations contained in paragraph 73 of the Complaint are conclusions of law that do not require a response from Defendants at this time.

74.    The allegations contained in paragraph 74 of the Complaint are conclusions of law that do not require a response from Defendants at this time.

75.    The allegations of paragraph 75 of the Complaint are hereby denied.

76.    The allegations of paragraph 76 of the Complaint are hereby denied.

77.    The allegations of the first sentence of paragraph 77 of the Complaint are hereby denied for lack of information or belief on which to form an opinion as to their veracity. The allegations of the rest of paragraph 77 of the Complaint are hereby denied. Defendants affirmatively allege that creditors are being paid, taxes are being paid, and loan interest rates have

been lowered. Despite her attempts to meddle in the management of the hotel, and disparaging Defendants before third parties, there is no imminent financial harm threatening Plaintiff or her and Barbeau's interest in Pilgrim House.

78.    The allegations of paragraph 78 of the Complaint are hereby denied.

79.    The allegations of paragraph 79 of the Complaint are hereby denied.

80.    Defendants deny any statement or allegation of the Complaint that has not been expressly admitted in this Answer.

## AFFIRMATIVE DEFENSES

1.    This Honorable Court lacks jurisdiction over the subject matter of this lawsuit.

2.    Thie Honorable Court lacks jurisdiction over the person of the Defendants.

3.    Service of process was insufficient.

4.    A person who is subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction has not been joined as a party.

5.    This case should be dismissed for failure to join an indispensable party.

6.    The Complaint fails to state a claim upon which relief may be granted against Defendants.

7.    Some of the obligations that Plaintiff has placed in dispute are arbitrable and should be submitted to arbitration.

8.    Plaintiff is engaging in an abuse of the judicial process by filing this action.

9.    The doctrine of exceptio non adimpleti contractus applies to the Plaintiff's claims because, as a party in breach of the agreement herself, she is barred from enforcing contractual obligations assumed by other parties.

10. Plaintiff breached her duties of loyalty and care owed to the limited liability companies in which she is a member along with Defendants.

11. Defendants have not breached their agreements with Plaintiff and other third parties.

12. Plaintiff's actions are intended to coerce the defendants into selling the business.

13. The defendants have acted under the authority granted by the terms of the Agreements between them and have complied with their obligations under the agreement signed on February 27, 2023.

14. The plaintiff has appropriated assets for her sole benefit in violation of her fiduciary duties to Pilgrim House LLC and to the detriment of Pilgrim House LLC which in turn affected the interests of the defendants.

15. The plaintiff is responsible for the loss of business caused by her actions.

**COUNTERCLAIMS**

Defendants reallege and incorporate by reference their affirmative allegations contained in their Answer to the Complaint, and further allege:

1. Codefendant Kenneth J. Horgan (hereinafter "Horgan"), of legal age, married, a businessman, and a resident of the State of Massachusetts.

2. Codefendant Kevin Scott Bente (hereinafter "Bente") is of legal age, married, a businessman, and a resident of the State of Florida.

3. Horgan and Bente are married to each other.

4. Among his many businesses and ventures, Horgan has managed and operated hotels and venues in the hospitality industry for over 20 years.

5.      Plaintiff Maria Cirino (hereinafter "Cirino") is of legal age, and, upon information and belief, married, purportedly a venture capitalist, and a resident of the Commonwealth of Puerto Rico.

6.      Non-party Elizabeth Barbeau hereinafter "Barbeau") is of legal age, and, upon information and belief, married, retired, and a resident of Puerto Rico.

7.      Upon information and belief, Cirino and Barbeau are married to each other.

8.      In 2015, Barbeau was a new member of the Provincetown Tennis Club, in Provincetown, MA, where Horgan was the Manager and Tennis Pro. Horgan became Cirino's Tennis Coach and became friends.

9.      Prior to February 6, 2017, Horgan was the Manager of the Provincetown Tennis Club. He continued in this position the first year that Pilgrim House LLC existed.

10.     Horgan introduced Bente to Cirino and Barbeau on his first visit to Provincetown after meeting Horgan in Florida.

11.     After Bente met Cirino and Barbeau, Cirino and Horgan suggested that Bente move to Provincetown to open a Men's Retail Clothing store.

12.     Cirino stated she wanted Horgan and Bente to be able to be together year-round, and she owned a retail space located at 368 Commercial Street in Provincetown that was eventually leased to Bente and Horgan to open the shop.

13.     Cirino loaned Bente and Horgan $40,000 as seed money for the retail shop endeavor. Bente And Horgan paid back the $40,000 in the third year of the shop's existence.

14.     Cirino had purchased a home located at 6 Shore Road, Unit 7, North Truro, MA 02652 and offered it for Horgan and Bente to reside in.

18

15. Monthly rental payments were made directly to Cirino until Horgan and Bente were able to secure their own mortgage loan for the property and they purchased it from Cirino.

16. These facts show that there was a relationship established between the parties where Cirino advanced funds to assist Horgan and Bente and those funds being paid back in full.

17. Sometime after 2016, Horgan and Bente voiced their interest in exploring the Provincetown market for a small Bed & Breakfast property they could purchase and operate, and Cirino put them in contact with her Realtor, David Nicolaus ("Nicolaus").

18. Nicolaus contacted Horgan and Bente and suggested that they tour the Sage Inn and Lounge at 336 Commercial Street in Provincetown, MA, a property that had just been placed on the market.

19. After touring the property and receiving the financial data, Horgan and Bente discussed with Cirino and Barbeau while socializing that they were interested in purchasing the Sage Inn but that it was perhaps more expensive than they should consider.

20. Cirino and Barbeau called Horgan on the phone while he was working in Florida in February of 2017 and proposed investing in the venture to provide Horgan and Bente the opportunity to engage in the venture and financially prepare for their eventual retirement but only wanted to have their invested funds tied up for a maximum of ten years.

21. Cirino offered to provide $1 million dollars for use for ten years and proposed the framework for what became our partnership agreement.

22. The offer was made as an investment. Cirino's proposal was to have Cirino and Barbeau participate in the transaction as investment partners.

19

23. Horgan and Bente decided to purchase the real property and business that was operated as the Sage Inn to operate it as the Pilgrim House Hotel, and Cirino and Barbeau became investors in the project.

24. A Partnership Agreement dated February 6, 2017 was signed by Horgan, Bente, Cirino, and Barbeau as partners and owners.

25. The initial investment was $1 million with loans funding the remaining purchases. Each partner, thus, made an initial contribution of $687,000, which totaled $2,750,000.

26. The initial capital contributions served to purchase the real property and business of The Pilgrim House Hotel at a price of $2,650,000 and to have operating capital of $100,000.

27. Each partner in The Pilgrim House partnership agreed to have 25% ownership and share of the costs.

28. In addition, Horgan and Bente agreed to receive 25% of the profits from the business.

29. As the General Manager and operating partner, the partners agreed that salary for Horgan of $100,000 would be fair for a workload of 60-80 hours a week.

30. Cirino and Barbeau agreed to receive 25% of the profits in the business or $50,000. Cirino and Barbeau requested, and it was agreed that, after 10 years of profits distribution, Cirino and Barbeau would exit the partnership and receive a payment of $687,500 each and the greater of $500,000 each or 25% of the market value of the hotel business.

31. Thus, Cirino and Barbeau had no part in the purchase of the Sage Inn and Lounge business except for their investment to secure their "silent investor" role in the business for a limited period of ten years with a detailed exit plan articulated in the Partnership Agreement.

20

32.    In conjunction with the purchase of the identified parcel, in consultation with Cirino Mr. Horgan negotiated and secured the purchase directly from the owner for just over $1 Million dollars of the adjoining building, which was part of the same condominium association.

33.    The final amount varied once Horgan secured the agreement to purchase from the former owner.

34.    The adjoining building provided immediate expansion opportunities for The Pilgrim House LLC. Mr. Horgan worked exclusively as the agent on behalf of the partnership in closing that deal.

35.    The adjoining building was also intended and planned to become the home of the men's clothing store owned by Horgan and Bente.

36.    Once Horgan was able to negotiate and secure this highly profitable transaction, meant to benefit the new business, Cirino demanded that Lyn Plummer not rent the unit intended for our store.

37.    Instead, she directed Plummer to renew a lease at a much lower rent than Horgan and Cirino had discussed. This was Horgan's and Bente's first insight into Cirino's propensity to wield absolute power without consequence.

38.    Once that transaction was executed by Horgan, Cirino informed Horgan and Bente that she intended to breach the agreement by purchasing the front building as an asset to be owned by the 336R Commercial Street (Pilgrim House) partnership, without discussion or notice of any kind to Horgan or Bente.

39.    Instead, Cirino created her own LLC under the name 336 Commercial Street, excluding Horgan and Bente, and executing the transaction instead for her personal financial benefit.

21

40.     The front building was purchased and is currently owned by 336 Commercial Street LLC, whose members are Lyn Plummer, Cirino and Barbeau.

41.     At the time of the purchase, that property had six of its ten units vacant.

42.     The primary tenants of the building were public clinics, including a needle exchange clinic that presented major issues with clients that would enter the second floor of the "front" building through our lobby and used our elevator because, without our elevator, the front building would have no ability to rent the second floor to any public-facing business due to American with Disability Act limitations.

43.     There were no stipulations that the agreement was contingent upon mortgages being secured for the establishment of "Equal Partners".

44.     The Pilgrim House Hotel has been dedicated since 1810 to THREE focused revenue streams. Along with Hotel, Food & Beverage, Entertainment Programming was and remains a major source of revenue.

45.     Average annual revenue generated from Ticket Sales is $1 million dollars.

46.     Upon the formation of their Partnership, Horgan, Bente, Cirino, and Barbeau agreed unanimously that the hotel would receive $100,000 annual compensation as fair market wage for the exclusive attention and dedication of 60-80 hours a week to Operations of the Hospitality Complex.

47.     However, since the summer of 2017, Cirino has regularly and actively directed the payment of expenses from operations.

48.     Cirino would visit the business with no advance notice or communication with Horgan and make demands of the staff and management team, often creating confusion and operational challenges.

49. On several occasions, Cirino would form opinions of operations based on limited feedback from a small group of her personal friends.

50. For example, in 2017 and into 2018, Cirino had decided that she "did not trust a vegetarian chef" and demanded that Horgan fire chef Lucio Garnica.

51. This would have paralyzed operations, and he had done nothing to deserve to be fired. After conversations with our Human Resources Specialist, I informed Cirino that Garnica was not going to be fired based on her dislike of vegetarians.

52. In response, she immediately began a two-week campaign with the intent of humiliating, embarrassing, frustrating, and ultimately infuriating Garnica to the point that he decided to quit.

53. She would attack him personally and publicly in front of guests and employees.

54. The front building that was purchased with the intention of providing growth opportunities for the Pilgrim House Hospitality Complex, remained underutilized because Cirino and Plummer struggled to rent any of the vacant units.

55. In 2018, Cirino insisted that the Pilgrim House Hotel should rent several of these vacant units in her front building. From 2018 to 2021, over $50,000 was paid in rent from Pilgrim House Hotel to Cirino's companies, 336 Commercial Street LLC and DolFin Management LLC.

56. Leases were executed between the companies, with Cirino acting as a party to both the Lessor and the Lessee.

57. Pilgrim House had previously paid for the renovations of each of the units that were leased at the direction of Cirino.

58. Those expenses exceeded $15,000 across that same time frame of 2018 to 2021.

59. Insisting on developing their unrentable and less desirable remaining front building

23

units, Cirino and Plummer presented a plan in 2018 to have Pilgrim House build three new "Staterooms" in place of units # 8, 9, and 10 at their building, along with a plan to combine units 6 and 7 to create a new cabaret space.

60.    Unit 4 was built out by Pilgrim House as a ticket office (totally redundant) and proved to be costly and remained closed most of the season.

61.    All the development, however, was to be funded by Pilgrim House.

62.    The project scope was enormous.

63.    The use and management of water resources in this region of Massachusetts is particularly sensitive.

64.    The planning, approval, and development process was extensive and called for the petition and eventual granting of a Massachusetts Economic Development Project Waiver.

65.    The Economic Development Approval for the project would only be possible with the flexing of Pilgrim House assigned gallons of water use ("Gallons") from the building owned by the initial four partners to the building owned by Cirino.

66.    This refers to a temporary adjustment or relaxation of water usage restrictions that allow leeway in water consumption beyond the normally mandated limits, while still encouraging responsible water use.

67.    The allotted flow of water of the Pilgrim House property is a valuable asset and was transferred to allow the project to proceed.

68.    These Gallons of water were registered with the Barnstable County Courthouse on record as "flex" gallons owned by Pilgrim House LLC and were to revert to the Pilgrim House parcel if either of the properties had any change in ownership.

24

69.     The entire process took three years, under a massive effort, leading to legal expenses, and was only ever to be a temporary use for Pilgrim House assets in a FLEX state with clear legal rules that the gallons would revert to Pilgrim House if the ownership structure changed in either building.

70.     The total cost of securing these "gallons" in total was more than $200,000 – this entire cost was paid for by the Sage Inn entity and then by the Pilgrim House entity.

71.     Cirino used her shared ownership of both plots to first "flex" the Gallons for her exclusive benefit and then, in 2024, hired legal counsel to file a permanent reassignment of these gallons so that the value of the front building would increase as she put it on the market in 2024.

72.     The last insult came as Cirino directed the cost of these Gallons to be paid by Pilgrim House, including AFTER the permanently reassigning the gallons to a total of more than $50,000.

73.     This number is included in Cirino's claim against us as "Pilgrim House unpaid expenses," but Horgan and Bente are challenging the town of Provincetown regarding the remaining outstanding fees that are still assessed in error to our property.

74.     Even to this day, Lyn Plumber is claiming that our Grease Trap is part of her building and has unilaterally claimed ownership of our asset so that she may rent out one of the units to a new tenant.

75.     The market value of these "Gallons" is calculated at over $275,000 and would not have been otherwise available to Cirino for the project that added value to her property.

76.     The total cost of the renovations of the 3 units of Cirino's building exceeded the $250,000 loan (loan was taken out by Cirino and Plummer but to be paid back by Pilgrim House according to the repayment schedule described) with the incremental funds coming from Pilgrim

House. Bente and Horgan demanded but never received an itemized accounting of the expenses paid for the build-out using the $250,000 from the Pilgrim House.

77.     These expenses are also part of Cirino's claim of "Pilgrim House unpaid expenses".

78.     Upon information and belief, the Lease Agreements documents prepared and presented to Lyn Plummer (the "Lease Agreements") were drafted at the suggestion of an Eastern Bank Loan Officer to move the loan through the approval process.

79.     Eastern Bank was the issuer of the $250,000 loan. The leases were never intended to be executed leases for the three units.

80.     There was, instead, a profit-sharing agreement from the net revenue from the nightly rental of the units that provided Cirino and Plummer compensation.

81.     None of the agreements between the parties gave Cirino final approval of any sale, only the right to solely market, negotiate and present offers.

82.     At the same time, Cirino's involvement with Pilgrim House LLC & 336R Commercial Street LLC has been to extract value, cash, and resources for her immediate personal enrichment.

83.     Over the objection of Horgan and Bente, Cirino insisted that only her personal Tax and Accounting Firm be permitted to review, prepare, file, and record all tax returns.

84.     The bill for these services, directed at Cirino's exclusively has been received and is over $25,000 from WA Leonard.

85.     The detailed invoices mention "make changes to financial books provided by the bookkeepers to match Cirino's return".

86.     None of the services that WA Leonard is currently invoiced to the Pilgrim House have anything to do with the normal course of operations NOR have anything to do with the standard work flow of financial recording.

87.     Our Bookkeeping Firm has some serious questions with the variances between our books and the tax returns (that Horgan did not see or sign before they were submitted to Cirino's personal Lawyer and Accountant).

88.     Cirino also directed all communication to and from those firms; first Edelstein & Company (now combined with EisnerAmper), and now WA Leonard & Company PC, should flow through her exclusively.

89.     Despite being the operator of the hotel, Horgan cannot currently get the owner or any of the principal partners at WA Leonard to reply to his requests for information on some concerning abnormalities in their adjustments to the business's books.

90.     Cirino went so far as to insist that Horgan execute a Power of Attorney during the first quarter of 2024, to allow WA Leonard full authority to act on behalf of the organization for Trust Tax management, Corporate Tax Filings, and ALL other official financial transactions.

91.     Despite these shortcomings, the growth and success of the hotel business over the last seven years outpaced all plans, industry norms and local competitors.

92.     Under Horgan's management, they have doubled revenue and re-established the Pilgrim House as Provincetown Premier Entertainment Venue – featured in several National Broadcasted Television features, including a 30-minute special feature that runs still today with viewership north of 25 million Americans.

93. There was no delinquency of the initial loan in February 2023, the time of the second loan discussion and there was no lawsuit or plans to end the Zoso California venture in short order.

94. The Employee Retention Tax Credit ("ERTC") payment to be made to Cirino was intended to be net, of expenses not gross, because there was a cost incurred with the accounting firm to prepare and file the request.

95. The discrepancy in Cirino's current version of the accounting triggered the "penalties" that she is claiming in this dispute. There was an understanding that the full obligation of the loans was resolved with the transfer of the ERTC funds.

96. Although Cirino insists that the ERTC total distribution was $337,500, this amount does not include the expenses that were incurred in relation to the lengthy process of assembling the data, producing evidence of payroll, recording and reporting of all W2, and other required tax and business records. The payment was indeed made before the agreed August 31, 2023 deadline; on July 19, 2023 by a transfer of funds in the amount of $228,239.71, or 75% of the net proceeds of the credit.

97. The total payments to BeanCounters LLC, the accounting firm that was at least allowed to provide these services without Cirino's meddling, were much higher than the difference that Cirino claims that she was underpaid.

98. Immediately upon receiving the payment in questions, Horgan contacted Cirino and executed a wire transfer within 24 hours.

99. Full disclosure, accounting and discussion of the ERTC details and value occurred between Horgan, Bente, and Cirino.

100. There was no further communication, mention in person or formal request or attempt to collect on the contended loan before January 2025.

101. At no time before Cirino's decision to state her claim in 2025 did she object to accepting the net ERTC payment as payment in full for all outstanding loan obligations.

102. At that time, a full audit was performed and Cirino and Horgan reviewed in detail, all expenditures from 2022 and 2023.

103. At one point, Cirino identified what she termed "questionable" expenses of $52,000 over the two-year period and demanded that Horgan and Bente repay the company immediately.

104. Without challenge or agreement of her characterization, Horgan and Bente made the payment the next business day.

105. Cirino's additional demands and claims have been made to reframe, create, or modify documents without Horgan's and Bente's understanding or agreement.

106. Cirino regularly demanded that Horgan and Bente sign documents that she insisted had no bearing on the partnership - including changing the legal structure from an LLC to an LP. She misrepresented that these documents were only to help her pay less taxes - along with her relocation to Puerto Rico.

107. Cirino's contention that there have been annual $100,000 disbursements in arrears with penalty per Partnership Agreement is also incorrect and the result of her insistence at self-dealing.

108. During the Covid years, in lieu of paying Cirino and Barbeau, or Horgan and Bente, any distribution or salary, full rent was paid from Pilgrim House to Cirino's entity that is the owner of the front building.

109. At that time, due to the pandemic, the Commonwealth of Massachusetts had imposed a freeze on rent during much of the Covid pandemic.

110. Cirino insisted that rent be paid to her regardless.

111. Much of the past due payments that Cirino identifies in her claim were choices in prioritization of payments that had to be made during Covid and through the payment of the buildout of her building.

112. In the Fall of 2024, Cirino at a meeting with Bente and Horgan, recommended to Bente directly that he should liquidate his Florida properties and use the proceeds to satisfy obligations incurred from the Zoso CA venture.

113. Cirino did not make any reference to any outstanding obligations to her.

114. In addition to the Zoso CA obligations, the inevitability of legal expenses associated with Cirino's lawsuit prompted the decision to place the Florida properties on the market.

115. The North Truro property, soon to become Bente and Horgan primary residence, is not on the market.

116. Cirino has falsely accused Horgan of tax evasion, embezzlement, and fraud, communicating those statements to Management, Employees, Contractors, and the public via Lyn Plumber by making statements such as "Ken does not own Pilgrim House" and "authorities will arrest him soon."

117. Cirino has obstructed Pilgrim House's entertainment programming, by besmirching Horgan's reputation, and causing more than 12 artists who had agreed to perform at the Pilgrim House to break their commitments, which is projected to cause a revenue loss that could approximate $1 million.

30

118.    At Cirino's behest, Lyn Plumber threatened the Pilgrim House Hotel's Operations Manager's housing and employment status.

119.    Cirino demanded the termination of an employee from Puerto Rico.

**FIRST CLAIM FOR RELIEF**

**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS**

120.    Defendants reallege and incorporate by reference the allegations contained in paragraphs 1 to 119 of this Counterclaim.

121.    Cirino has personally, directly, and indirectly through third parties, interfered with contractual relationships entered into by Horgan on behalf of Pilgrim House LLC by intentionally besmirching Horgan's reputation, with the specific intent to cause more than 12 artists who had agreed to perform at the Pilgrim House entertainment venue to break their commitments.

122.    Over 12 artists who had agreed to perform at the Pilgrim House Hotel in 2025 have withdrawn their commitments to do so as a result of Cirino's and her third party assistants's specific interference.

123.    The withdrawal of the artists' commitments to perform at the Pilgrim House Hotel was a direct result of Cirino's and her third party assistants' specific interference.

124.    Cirino has caused damages to Defendants as a result of her interference that may surpass $1 million.

**SECOND CLAIM FOR RELIEF**

**DEFAMATION**

125.    Defendants reallege and incorporate by reference the allegations contained in paragraphs 1 to 124 of this Counterclaim.

31

126.    Cirino has falsely accused Horgan of tax evasion, embezzlement, and fraud, communicating those statements to third parties with the specific intent of damaging Defendants' reputation and knowing that her statements would cause monetary harm to Defendants.

127.    The harm caused by Cirino's false statements about Defendants has caused them damages that, at this time, are difficult to calculate, but are estimated to surpass $250,000.

**THIRD CLAIM FOR RELIEF**

**ATTORNEYS' FEES AND COSTS**

128. Defendants reallege and incorporate by reference the allegations contained in paragraphs 1 to 127 of this Counterclaim.

129.    Cirino has acted in bad faith and obstinately in filing this lawsuit and is liable to Defendants for their reasonable attorneys' fees and costs.

JURY DEMAND

130.    Defendants demand a trial by jury on all issues before the Court.

WHEREFORE, Defendants respectfully request that this Honorable Court enter judgment DISMISSING the Complaint and GRANTING the relief requested in the Counterclaim, in addition to imposing costs, interest, and attorneys' fees in Defendants' favor.

RESPECTFULLY SUBMITTED.

I CERTIFY: That on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to all attorneys of record.

In San Juan, Puerto Rico, this 21st day of April, 2025.

**GOLDMAN ANTONETTI & CORDOVA, L.L.C.**
*Attorneys for the Defendants*
PO Box 70364
San Juan, Puerto Rico 00936-8364
Tel: 787.759.4117
Fax: 787.767.9333

s/Carlos A. Rodríguez Vidal
USDC-PR No. 201213
crodriguez-vidal@gaclaw.com