**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

MARIA CIRINO,

        Plaintiff,

           v.

KENNETH J. HORGAN and KEVIN SCOTT
BENTE,

        Defendants.

**Civil No. 25-1097 (GMM)**

## OPINION AND ORDER

Several motions stand before this Court. Plaintiff Maria Cirino ("Plaintiff" or "Ms. Cirino") filed a *Motion to Dismiss Amended Counterclaim (ECF No. 22)* ("*Motion to Dismiss*"). (Docket No. 34). Ms. Cirino then filed a *Third Urgent Informative Motion* at Docket No. 49, to which Defendants Kenneth J. Horgan ("Mr. Horgan") and Kevin Scotte Bente ("Mr. Bente") (collectively, "Defendants") in response filed a *Motion to Exclude or Strike "Third Urgent Informative Motion" (Dkt. #49) or, in the Alternative, to Grant Defendants Leave to Respond to All Three "Urgent Informative Motions"* ("*Defendants' Motion to Strike*"). (Docket No. 55). Plaintiff also submitted a *Motion for Partial Summary Judgment and for Declaratory Judgment* ("*Motion for Partial Summary Judgment*") at Docket No. 51; a *Motion Requesting that Maria Cirino's Motion for Partial Summary Judgment and Statement of Uncontested Material Facts Be Deemed Unopposed* ("*Motion Requesting*

Civil No. 25-1097 (GMM)
Page -2-

*PSJ Be Deemed Unopposed*") at Docket No. 52; and a *Motion to Strike Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment and for Declaratory Judgment or, in the Alternative, For Leave to File Reply* ("*Plaintiff's Motion to Strike*"). (Docket No. 56).

For the reasons discussed below, the Court **GRANTS** Plaintiff's *Motion to Dismiss*, **DENIES** *Defendants' Motion to Strike*, **NOTES** Plaintiff's *Third Urgent Informative Motion*, **DENIES** Plaintiff's *Motion for Partial Summary Judgment*, **DENIES** Plaintiffs' *Motion Requesting PSJ Deemed Unopposed*; and **DENIES** *Plaintiff's Motion to Strike*.

## I.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

At the heart of this case sits the Pilgrim House Hotel ("Pilgrim House"). The Provincetown, Massachusetts property is a lodging and entertainment site co-owned by the parties. *See* (Docket Nos. 50 at 2 ¶ 5; 53-1 at 2 ¶ 5). Plaintiff wants to sell Pilgrim House. (Docket No. 1 at 1). The hotel is in arrears, Ms. Cirino alleges; she wants to offload the property quickly and receive remuneration for debts she believes Defendants owe her. (Id.). Mr. Horgan and Mr. Bente disagree. *See generally* (Docket No. 22). They contend Ms. Cirino's version of the debts are incorrect; she doesn't have the power to sell the property unilaterally; and it is Ms. Cirino, not them, who caused the purported economic harms because Plaintiff allegedly interfered with entertainment

contracts and spread false statements about Defendants. (Id. at 23-35). Both parties ask for this Court's intervention.

Some background on how the parties got here. Ms. Cirino and her partner Elizabeth Barbeau ("Ms. Barbeau") struck a business deal with Mr. Horgan and his partner Mr. Bente in February 2017. (Docket Nos. 50 at 2 ¶ 5; 53-1 at 2 ¶ 5). On February 17, 2017 the four executed a *Purchase and Sale Agreement* to buy Pilgrim House for $2,6500.000. (Docket Nos. 50 at 2 ¶ 5; 53-1 at 2 ¶ 5). The next day, all four entered into a *Partnership Agreement*, wherein they declared that each held an equal twenty-five percent ownership interest in Pilgrim House. (Docket Nos. 50 at 2 ¶¶ 6, 8; 53-1 at 2-3 ¶¶ 6, 8). They all signed an *Operating Agreement* on April 18, 2017, reiterating this joint ownership split. (Docket Nos. 50 at 2 ¶ 10; 53-1 at 3 ¶ 10).

Roughly five years later, on February 27, 2023, a subset of the owners – Ms. Cirino, Mr. Horgan, and Mr. Bente, to the exclusion of Ms. Barbeau – signed another agreement, at center stage in this dispute. (Docket Nos. 50 at 3 ¶ 13; 53-1 at 4 ¶ 13). The *Agreement Among Maria Cirino, Ken Horgan, and Scott Bente* (the "*Advance Agreement*"), as drafted, describes Ms. Cirino as having lent Mr. Horgan and Mr. Bente $125,000 in October 2022 ("October loan") for business activities related to the pair's business venture in Palm Spring, California at another hotel, Hotel Zoso; it also notes that Mr. Horgan and Mr. Bente were delinquent on

other payments owed to Ms. Cirino related to Pilgrim House. (Docket Nos. 50 at 3 ¶ 15; 53-1 at 4 ¶ 15). To receive an additional $200,000 advance and $35,000 loan - later amended to a $20,000 loan - and not have to repay either the October loan or the advance, the *Advance Agreement* required Mr. Horgan and Mr. Bente to agree to certain terms and conditions. (Docket Nos. 50 at 4-5 ¶¶ 16-22; 53-1 at 6-8 ¶¶ 16-22).

Relevant here are two: first, that "75% of the amount received in relations to the Employee Retention Credit [("ERC")] is wired to Cirino within 24 hours of receipt"; and second, Defendants agree that Ms. Cirino "shall have full decision-making authority on the valuation, timing and strategy with respect to the sale of the Pilgrim House Hotel notwithstanding any agreement to the contrary." (Docket Nos. 50 at 4-5 ¶¶ 16-22; 53-1 at 6-8 ¶¶ 16-22). If these conditions are not met, the $200,000 advance would be converted into a loan; and if the loan was not paid in full by December 31, 2024, then Defendants would automatically "agree to transfer 5% of their interest in the Pilgrim House Hotel to Cirino (or as directed by Cirino)." (Docket Nos. 50 at 5 ¶ 21; 53-1 at 7-8 ¶ 21).

Separately, the *Advance Agreement* also states that Defendants were "past due on existing hotel payments and rents to Cirino (or entities affiliated with Cirino)" and requires Defendants to pay off those debts by October 31, 2023; if not, "then a 25% penalty

Civil No. 25-1097 (GMM)
Page -5-

shall accrue and compound every six (6) months until the amount is settled." (Docket Nos. 50 at 5 ¶ 20; 53-1 at 7 ¶ 20).

Since the *Advance Agreement*, Plaintiff advances that Defendants have: accrued underpaid debts, including the ERC, and allowed debts to lapse; mismanaged Pilgrim House's tax filings and overall finances; blocked Ms. Cirino's access to bank records; and amassed loans that have cost Ms. Cirino her Massachusetts state tax refunds and threatened foreclosure of Pilgrim House. *See* (Docket No. 1 at 8-11). This moved Ms. Cirino to try and sell Pilgrim House, which she understood to have "total dominion" over based on the *Advance Agreement*. (Docket Nos. 51 at 10; 1 at 11-12 ¶ 41). Defendants refused. (Docket No. 22 at 5 ¶ 13).

As a result, Ms. Cirino filed a *Complaint* on February 14, 2025, seeking declaratory relief to clarify the rights she believes she's owed pursuant to the *Advance Agreement* – paramount perhaps that she has "full decision-making authority" to sell Pilgrim House and is owed compensatory damages for past due loans and associated interest related to the breach of the *Advance Agreement*. (Docket No. 1 at 15-22). Plaintiff attaches to her *Complaint* multiple documents, including: the signed *Advance Agreement* (Docket No. 1-1); a notice indicating that Ms. Cirino's Massachusetts tax refunds were seized because of existing debt (Docket No. 1-2); a notice threatening to suspend Ms. Barbeau's driver's license based on overdue debts Ms. Cirino attributes to Defendants (Docket No. 1-

3); and a demand letter sent to Defendants prior to the filing of this lawsuit, along with unsigned proposed contracts to ratify Ms. Cirino's authority to sell Pilgrim House and transfer a percentage of ownership from Defendants to Ms. Cirino pursuant to the *Advance Agreement*. (Docket No. 1-4).

On May 12, 2025, Defendants filed an *Amended Answer to the Complaint and Amended Counterclaims* ("*Amended Answer*"). (Docket No. 22). Mr. Horgan and Mr. Bente deny much of Ms. Cirino's version of events. (Id. at 2-18). They instead paint a different picture. Defendants allege that Ms. Cirino was a silent partner that is now aggrandizing power to sell the hotel for her personal gain by taking advantage of their financial situation. *See* (id. at 12, 19-20). Defendants claim "creditors are being paid, [and] taxes are being paid"; Ms. Cirino maintains access to the proper bank accounts; they've regularly repaid loans owed to Ms. Cirino; and "[a]ny payments in arrears can be met at the time of a sale or at the 10-year buyout provision timetable" governed by the original contract. (Id. at 10-11, 18, 30-32).

Mr. Horgan and Mr. Bente also repudiate the *Advance Agreement* in its entirety. They assert that the contract "should be nullified or revised" pursuant to Article 1258 of the Puerto Rico Civil Code, P.R. Laws. Ann. tit. 31 § 9841 ("Article 1258") by way of Ms. Cirino "maliciously tak[ing] advantage of [their] need and economic dependence" and under Article 1328 of the Puerto Rico

Civil Code, P.R. Laws. Ann. tit. 31 § 10085 ("Article 1328") for usury. (Id. at 18-19).

Even if the *Advance Agreement* were valid, Mr. Horgan and Mr. Bente contest Ms. Cirino's interpretation of it. Defendants aver that the ERC was paid in full, as the parties had an agreement that it would be based on net, not gross proceeds, so Defendants did not violate the *Advance Agreement* as to that term. (Id. at 6 ¶ 17). Moreover, Mr. Horgan and Mr. Bente allege that the plain language of the *Advance Agreement* does not give Ms. Cirino the unequivocal right "to execute a sale out of her own volition." (Id. at 5 ¶ 13). "The agreement does not stipulate that Defendants must agree to just any offer that results from Plaintiff's right to the listing of the business (value, timing, and strategy)." (Id. at 16 ¶ 62).

On top of this, Defendants bring counterclaims. (Id. at 34-36). Defendants allege a count of defamation against Plaintiff because "Cirino has falsely accused Horgan of tax evasion, embezzlement, and fraud, communicating those statements to Management, Employees, Contractors and the public via Lyn Plummer by making statements such as 'Ken does not own Pilgrim House' and 'authorities will arrest him soon,'" with the "specific intent of damaging Defendants' reputation," the impact of which Defendants find "difficult to calculate, but [is] estimated to surpass $250,000." (Id. at 33 ¶ 116, 35 ¶¶ 131-32). More than twelve of

these alleged contractors - entertainers such as Miss Conception, Peaches Christ, Hedda Lettuce, and Madame, who were slated to perform at Pilgrim House for the summer 2025 season – allegedly reneged due to Plaintiff's statements, "caus[ing] a revenue loss [to Pilgrim House] that could approximate $1 million." (Id. at 33-35 ¶¶ 117, 122-27). Defendants also claim that these facts also provide the basis for another counterclaim: tortious interference with contractual relationships. (Id. at 34-35 ¶¶ 125-29). Mr. Horgan and Mr. Bente bring a third claim for relief to recover attorneys' fees and costs as well. (Id. at 36 ¶¶ 133-34).

A squall of motions soon followed. The Court narrows its inquiry to the documents recounted below.

A.    Plaintiff's *Motion to Dismiss*

On May 23, 2025, Ms. Cirino filed her *Motion to Dismiss*. (Docket No. 34). She asserts that Defendants fail to state a claim under Federal Rule of Civil Procedure 12(b)(6) and fail to join a required party under Rule 12(b)(7), both of which militate dismissal. (Id. at 1).

Ms. Cirino makes four arguments to support her motion. First, as to the tortious interference claim, Plaintiff states that Defendants do not effectively plead the necessary elements. (Id. at 3). She asserts that Mr. Horgan and Mr. Bente failed to allege the existence of a contract between any third party or the specifics of that contract, including whether there was a fixed

Civil No. 25-1097 (GMM)
Page -9-

term. (Id. at 6-7, 9-10). Even if there were a contract, Plaintiff alleges that the parties' *Partnership Agreement* plainly states that decisions requiring a contract require a "unanimous vote"; and since Defendants do not plead that all partners agreed to hire the entertainers – as they cannot – Plaintiff alleges no contract could have existed for her to have interfered with, nonetheless intentionally so. (Id. at 7-8, 11).

Second, Plaintiff alleges that Defendants similarly fail to meet the pleading standard for their defamation claim. (Id. at 3). Ms. Cirino argues Defendants' allegations are conclusory and insufficient because they do not "plead the circumstances in detail, meaning to who, what, when, where, and how," of the statements made to allegedly ruin Defendants' reputation and business. (Id. at 11, 15 & n.4, 16). The statements were also allegedly made not by Ms. Cirino but by Lyn Plummer, who is not a party to this case, so Plaintiff believes she should not be liable for a statement made by someone else. (Id. at 15). Nor is it plausible on its face, Ms. Cirino says, that "Plaintiff would do anything detrimental to Defendants' business as that would be tantamount to a self-inflicted wound," since badmouthing Defendants would likely harm the resale value of Pilgrim House, thus affecting Plaintiff as well. (Id. at 16).

Ms. Cirino makes her last two arguments briefly. As to the third claim for attorneys' fees and costs, Plaintiff contends it

Civil No. 25-1097 (GMM)
Page -10-

should be dismissed because attorneys' fees are remedies, not a
cause of action. (Id. at 17). Finally, Ms. Cirino argues that,
even if the claims survive 12(b)(6) review, they should fall for
failure to join Lyn Plummer in the lawsuit, who allegedly made the
defamatory statements that led to the supposed interference with
contractual relations with the entertainers. (Id. at 17-20).

On June 6, 2025, Mr. Horgan and Mr. Bente submitted their
*Opposition to Motion to Dismiss Amended Counterclaims* ("*Opposition
to MTD*"). (Docket No. 36). As to the defamation claim, Defendants
assert that they pled specifically that "Plaintiff reached out to
contracted performers" and "Plaintiff's comments to entertainers
paint[ed] Horgan as an embezzler, a criminal, and a person soon to
be serving jail time," along with the allegations including Lyn
Plummer, which they believe satisfies the required elements. (Id.
at 6-7) (*quoting* Docket No. 22 at 13 ¶ 45). As to tortious
interference, Defendants point to their *Amended Answer* to allege
that: Mr. Horgan signs all contracts with performers; Defendants
properly alleged the existence of contracts; and Ms. Cirino
improperly relies on her own interpretation of the *Partnership
Agreement*'s terms regarding the formation of the contract and this
Court should not consider these interpretations as authenticated.
(Id. at 6-9, 9 n.3). To supplement, Defendants submit their own
contract for the Court's consideration: an unsigned contract
between Pilgrim House and Miss Conception (Kevin Levesque, or "Mr.

Civil No. 25-1097 (GMM)
Page -11-

Levesque") detailing potential summer 2025 performances. (Docket No. 36-1). In a footnote, Defendants elaborate on their argument, providing new and specific information about Pilgrim House's attempt to contract with Mr. Levesque and another performer, and Ms. Cirino's alleged interference. (Docket No. 36 at 8 n.2). Finally, regarding 12(b)(7), Defendants aver Lyn Plummer is not an indispensable party because joint tortfeasors are not necessary for ascertaining remedies. (Id. at 9-11).

The parties filed two more motions reiterating their positions on this matter. On June 24, 2025, Plaintiff filed a *Reply to Opposition to Motion to Dismiss Amended Counterclaim* ("*Reply in Support of MTD*"). (Docket No. 39). Ms. Cirino admonishes Defendants for attempting to inject new facts in a footnote for the Court's consideration. (Id. at 3-4). Reorienting the Court to the *Amended Answer*, Plaintiff argues that Defendants' descriptions about what contracts are at issue are fatally vague and imprecise, and Defendants still fail to "establish that Plaintiff is a third party to the purported contracts." (Id.). Defendants' defamation claims, Plaintiff reargues, are equally conclusory and fail to specify any details that implicate Ms. Cirino. (Id. at 5). "[T]he statements attributed to Plaintiff are not alleged to have been made by her directly, but rather to have been communicated by Lyn Plummer . . . . and unnamed third parties." (Id.) (*citing* Docket No. 22 at 35 ¶ 126). Lyn Plummer and these unnamed third parties, therefore,

Civil No. 25-1097 (GMM)
Page -12-

are "the primary actors whose alleged conduct gives rise to the defamation claims" and must be included in the suit for it to proceed. (Id. at 6).

Defendants filed their *Surreply to Opposition to Motion to Dismiss Amended Counterclaim* ("*Surreply*") on July 3, 2025. (Docket No. 42). They disagree that they were implicitly amending their pleadings. (Id. at 2). Nevertheless, Defendants argue that, without considering any of their exhibits or new facts in the *Opposition to the MTD*, their *Amended Answer* sufficiently meets the pleading threshold for the reasons already mentioned. (Id. at 4).

B.    Plaintiff's *Third Urgent Informative Motion* and Defendants' *Motion to Strike*

While parties hashed out their differences regarding the *Motion to Dismiss*, Ms. Cirino filed a series of urgent informative motions to this Court, (Docket Nos. 28, 32), in support of Plaintiff's *Motion for Ex Parte Prejudgment Attachment*, which is pending before Magistrate Judge Marcos E. López ("Magistrate López"). (Docket No. 8). These motions allege that Defendants are liquidating their assets and attempting to sell their Florida properties to avoid financial liability in anticipation of an adverse judgment in this civil action. *See generally* (Docket Nos. 28, 32). Plaintiff urges the Court to take this into consideration as to prevent Defendants from becoming purposefully insolvent to

Civil No. 25-1097 (GMM)
Page -13-

satisfy a potential judgment and expedite the relief sought.
(Docket Nos. 28 at 2; 32 at 2).

Defendants moved to strike these motions respectively.
(Docket Nos. 30, 32). Both were denied by Magistrate López. (Docket
Nos. 45, 46).

Ms. Cirino's *Third Urgent Informative Motion* was filed on
August 14, 2025. (Docket No. 49). Plaintiff asks this Court to
consider nearly 300 pages of documents outlining the parties'
Massachusetts state court proceedings on conversion, fraud, and
corporate mismanagement claims that arise from the same events at
issue in this case, including a *Verified Complaint and Jury Demand*
and exhibits regarding the parties' contracts, as detailed above,
as well as financial records on mortgages, loans, expenditure
reports, text message communications between Ms. Cirino and Mr.
Horgan, social media screenshots of the Pilgrim House Facebook
page publicizing Hotel Zoso events, and demand letter
communications. (Docket No. 49-1).

Again, Mr. Horgan and Mr. Bente filed another *Motion to Strike*
on August 29, 2025, requesting this Court ignore the motion or, in
the alternative, allow Defendants to reply to all three urgent
motions. (Docket No. 55).

C.    Plaintiff's *Motion for Partial Summary Judgment*

Ms. Cirino also filed a *Motion for Partial Summary Judgment*
on August 14, 2025, at Docket No. 51, alongside a *Statement of*

Civil No. 25-1097 (GMM)
Page -14-

*Uncontested Material Facts in Support of Maria Cirino's Motion for Partial Summary Judgment and a Request for Declaratory Judgment* ("*Plaintiff's SUMF*") at Docket No. 50. There, Plaintiff requested this Court "declare her rights under the *Advance Agreement*, including her authority to direct the sale of the Hotel." (Docket No. 51 at 2). Plaintiff alleges that the *Advance Agreement* is valid, and Defendants breached the contract by not repaying the $20,000 loan. (Id. at 4-8). As a result, Ms. Cirino asks this Court to rule on the declaratory judgment claim, affirming she has "complete and unfettered right to control the sale" of the hotel and declaring that Ms. Cirino "is entitled to a 5% increase in her ownership interest in the Pilgrim House Hotel, and a corresponding 5% reduction in Defendants' ownership interests." (Id. at 9-10).

A day after Defendants' response deadline passed, on August 29, 2025, Plaintiff filed their *Motion Requested PSJ Be Deemed Unopposed*. (Docket No. 52).

That same day - without requesting leave to file tardy - *Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment and for Declaratory Judgment* was filed. (Docket No. 53). This was accompanied by *Defendants' Counterstatement of Contested and Uncontested Material Facts in Support of Defendants' Opposition to Maria Cirino's Motion for Partial Summary Judgment and Request for Declaratory Judgment* ("*Defendants' SUMF*"). (Docket No. 53-1). In their responsive

Civil No. 25-1097 (GMM)
Page -15-

pleading, Defendants highlight their genuine dispute of Ms.
Cirino's interpretation of the *Advance Agreement* and its validity
and whether they've defaulted on the ERC conditions. (Docket No.
53 at 14-23).

In response, on September 5, 2025, *Plaintiff's Motion to
Strike* was filed, requesting the Court not consider Defendants'
motion because it was filed a day late without permission from the
Court to do so. (Docket No. 56).

The above matters are now fully briefed and ripe for
disposition.

## II.    LEGAL STANDARD

Numerous legal standards guardrail the Court's analysis of
the motions before it.

### A.    Fed. R. Civ. P. 12(b)(6)-(7)

Foremost, this is a Court of limited jurisdiction. Federal
courts "possess only that power authorized by [the] Constitution
and [federal] statute[,] which is not to be expanded by judicial
decree." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375,
377 (1994) (internal citations omitted). "It is to be presumed
that a cause [of action] lies outside this limited jurisdiction
and the burden of establishing the contrary rests upon the party
asserting jurisdiction" Id. at 377 (internal citations omitted).
"Federal courts . . . therefore must be certain that they have
explicit authority to decide a case"; otherwise, dismissal is

warranted. Bonas v. Town of North Smithfield, 265 F.3d 69, 73 (1st Cir. 2011).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the pleadings, rather than the merits of the claim. *See* Twum-Baah v. Dep't of Agric., 299 F. Supp. 3d 369, 372 (D.P.R. 2018).

To survive a motion to dismiss, a claim must be plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A plaintiff, or here a counterclaimant, can meet this standard when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Plausible "means something more than merely possible." Zenon v. Guzman, 924 F.3d 611, 616 (1st Cir. 2019) (internal citations omitted). Gauging a pleaded situation's plausibility "is a 'context-specific' job that compels [the Court] 'to draw on' [its] 'judicial experience and common sense.'" Id. (*quoting* Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)). "Dismissal for failure to state a claim is appropriate if the complaint fails to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotation marks and citations omitted).

Civil No. 25-1097 (GMM)
Page -17-

Under Rule 12(b)(6), a pleading can be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When evaluating a motion under this rule, a court "must accept as true the well-pleaded facts of the complaint while simultaneously drawing all reasonable inferences in plaintiff's favor." LaChapelle v. Berkshire Life Ins., 142 F.3d 507, 508 (1st Cir. 1998). After doing so, a court must determine if the plaintiff's allegations are sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

While engaging in this analysis, a court "may augment the[] facts and inferences [from the complaint] with points gleaned from documents incorporated by reference into the countercomplaint, matters of public record, and facts susceptible to judicial notice." Starr Surplus Lines Ins. Co. v. Mountaire Farms Inc., 920 F.3d 111, 114 (1st Cir. 2019) (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)) (internal quotations omitted). In fact, when a complaint's factual allegations are "expressly linked to – and admittedly dependent upon – a document [offered by the movant] (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998) (citations omitted). Accordingly, federal courts have discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in

conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller Federal Practice and Procedure § 1366 (3d ed. 1998).

A 12(b)(7) motion, in turn, attempts to dismiss a claim for failure to join a party under Rule 19. Fed. R. Civ. P. 12(b)(7). This motion centers a "practical objective: to attain 'judicial economies of scale' by resolving related disputes in a single lawsuit, while also preventing that single lawsuit from becoming hopelessly complex or unending." Rivera Rojas v. Loewen Grp. Int'l, Inc., 178 F.R.D. 356, 361 (D.P.R. 1998) (quoting Pujol v. Shearson Am. Express, Inc., 877 F.2d 132, 134 (1st Cir. 1989)).

To grant a 12(b)(7) motion, a court must assess whether joinder is proper under Rule 19. This "is a three-step process that consists of: first, ascertaining whether the presence of the absentee is necessary, if so, whether joinder of the absentee is feasible and if not, if the presence of the absentee is indispensable to the proceedings." Colón v. Blades, No. 07-CV-1380-JAG, 2009 WL 10680942, at *3 (D.P.R. Jan. 21, 2009) (quoting Cook, Stratton & Co., Inc. v. Universal Ins. Grp., Inc., 241 F.R.D. 411, 417 (D.P.R. 2007) (citation modified)). If the absent party is both necessary and joinder is infeasible, then this Court must decide if it can proceed in "equity and good conscience" as defined in Rule 19(b). Id.

Civil No. 25-1097 (GMM)
Page -19-

B.    Fed. R. Civ. P. 56

Motions for summary judgment are governed by Rule 56. Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed R. Civ. P. 56.

At this stage of a dispute, this Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); *see also* Nadherny v. Roseland Prop. Co., Inc., 390 F.3d 44, 48 (1st Cir. 2004). In this position, a trial court is to make legal determinations, not involve itself in factfinding. *See* United Paperworkers Int'l Union Local 14 v. Int'l Paper Co., 64 F.3d 28, 31 (1st Cir. 1995).

"Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, there is not the slightest doubt as to whether a genuine issue of material fact exists." Hopgood v. Merrill Lynch, Pierce, Fenner & Smith, 839 F. Supp. 98, 103 (D.P.R. 1993), *aff'd*, 36 F.3d 1089 (1st Cir. 1994) (first *citing* Kennedy v. Josephthal & Co., 814 F.2d 798, 804 (1st Cir. 1987); then *citing* Peckham v. Ronrico Corp., 171 F.2d 653 (1st Cir. 1948)). An issue is genuine when it is dispositive; a fact is material it has the potential to affect the outcome of the suit. *See* id.

Civil No. 25-1097 (GMM)
Page -20-

The moving party bears the initial burden of proof; if that is met, the burden shifts to the non-moving party to produce sufficient evidence that demonstrates a jury is requires to resolve the differing versions of the truth. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986). The non-movant "must point to competent evidence and specific facts to stave off summary judgment." Tropigas de P.R. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011).

A court in evaluating a Rule 56 motion "does not ask which party's evidence is more plentiful, or better credentialled, or stronger." Greenburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). "Rather, the rule contemplates an abecedarian, almost one dimensional, exercise geared to determining whether the nonmovant's most favorable evidence and the most flattering inferences which can reasonably be drawn therefrom are sufficient to create any authentic question of material fact." Id.

An untimely opposition to a motion for summary judgment does not necessarily mean that the motion prevails. *See* Méndez v. Banco Popular de P.R., 900 F.2d 4, 7 (1st Cir. 1990). The Court still must conclude that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." Fed. R. Civ. P. 56(c); *see* Celotex Corp, 477
U.S. at 322.

"Be that as it may, the district court [is] not obliged to
consider [an] untimely opposition in applying the Rule 56
standard." Méndez, 900 F.2d at 7; *cf.* Rabal Pinto v. Universidad
de P.R., 895 F.2d 18, 19 (1st Cir. 1990) ("The court has no
obligation to play nursemaid to indifferent parties."); Higuera v.
Pueblo Int'l, Inc., 585 F.2d 555, 557 (1st Cir. 1978) ("There comes
a point when the question arises who is running the court —
counsel, or the judge. To this there can be but one answer.").

C.    Local Civ. R. 56

Motions for summary judgment are also governed by Local Civil
Rule 56. *See* Local Civ. R. 56. "Local Rule 56 is in service to
Federal Rule of Civil Procedure 56." López-Hernández v. Terumo
P.R., 64 F.4th 22, 26 (1st Cir. 2023) (*quoting* Tropigas de P.R.,
Inc., 637 F.3d at 56). It is an "anti-ferret rule . . . intended
to protect the district court from perusing through the summary
judgment record in search of disputed material facts and prevent
litigants from shifting that burden onto the court." Id.

Pursuant to this rule, the non-moving party must "admit, deny
or qualify the facts supporting the motion for summary judgment by
reference to each numbered paragraph of the moving party's
statement of material facts." Local Civ. R. 56(c). For facts that
are denied, a non-movant's "opposing statement shall support each

Civil No. 25-1097 (GMM)
Page -22-

denial or qualification by a record citation. . ." Id. The non-moving party's opposing statement may also contain "a separate section [of] additional facts, set forth in separate numbered paragraphs and supported by record citation." Id. The moving party may then submit a reply that admits, denies, or qualifies the nonmovant's additional facts through "a separate, short, and concise statement of material facts, which shall be limited to any additional fact submitted by the opposing party" that is supported by record citation. Id. 56(d).

"Under Local Rule 56, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated . . . when the statements contained in the movant's Statement of Uncontested Facts . . . are not properly controverted." López-Hernández, 64 F.4th at 26; *see also* Ramírez-Rivera v. DeJoy, 2023 WL 6168223, at *2 (D.P.R. Sep. 22, 2023) ("The First Circuit's repeated admonition on this issue in the last few years, places the Puerto Rico federal bar on clear notice that compliance with Local Rule 56 is a mandate, not a suggestion.").

## III. ADMISSIBILITY OF PLAINTIFF'S THIRD URGENT INFORMATIVE MOTION

Before the Court proceeds to evaluate Plaintiff's *Motion to Dismiss* or *Motion for Partial Summary Judgment*, it must first

Civil No. 25-1097 (GMM)
Page -23-

address Plaintiff's *Third Urgent Informative Motion* and subsequent *Defendants' Motion to Strike*.

First Circuit case law is clear on this point. "It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand." Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990); Maher v. Hyde, 272 F.3d 83, 86 n.3 (1st Cir. 2001); Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 19 (1st Cir. 2004). The *Third Urgent Informative Motion* is undeniably relevant to the instant case, as it submits a copy of Plaintiff's verified complaint before the Massachusetts state court which includes critical information and exhibits – key among them communications between the parties, financial records, and the *Advance Agreement* – that strike at the core of this case.

The *Third Urgent Informative Motion* is also properly authenticated at this stage of proceedings since this motion presents a verified complaint. "A verified complaint is considered the equivalent of an affidavit for purposes of record evidence." Gravel v. Spence, No. 23-CV-00315, 2024 WL 37688, at *1 (D. Me. Jan. 3, 2024) (*citing* Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991) (verified complaint treated as "functional equivalent of an affidavit" for summary judgment purposes to the extent it satisfies the standards for evidence presented in a summary judgment motion)).

Civil No. 25-1097 (GMM)
Page -24-

The Court's notice of this motion, however, is necessarily cabined. "[P]laintiff[] cannot sidestep [a] neglect to offer evidence in this case by asking the court to rule on the basis of the record in another case." Guzmán-Ruíz v. Hernández-Colón, 406 F.3d 31, 36 (1st Cir. 2005); see also MVM Inc. v. Rodriguez, 568 F. Supp. 2d 158, 164 (D.P.R. 2008). As such, the acceptance of Plaintiff's urgent informative motions is not to be construed as this Court greenlighting any attempts by Plaintiff to shirk off its responsibilities under the Federal Rules of Civil Procedure to engage in further discovery. This Court retains its right to make its own findings of facts, primarily because "[f]acts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b): they are not usually common knowledge, nor are they derived from an unimpeachable source." MVM Inc., 568 F. Supp. 2d at 164 (quoting Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998)).

Consequently, Plaintiff's *Third Urgent Informative Motion* is **NOTED** and *Defendants' Motion to Strike* is **DENIED**.[1]

---

[1] Considering that Defendants implicitly concede to this ruling by employing this same rationale in their recent motions, *see* (Docket Nos. 72 and 80), the Court need not elaborate further.

## IV.   MOTION TO DISMISS

Having addressed evidentiary concerns, this Court proceeds in chronological order to address Plaintiff's *Motion to Dismiss*.

A "'federal court[] sitting in diversity,'" as here, must "'apply state substantive law and federal procedural law.'" <u>Suero-Algarín v. CMT Hosp. HIMA San Pablo Caguas</u>, 957 F.3d 30, 39 (1st Cir. 2020) (*quoting* <u>Gasperini v. Ctr. for Humans., Inc.</u>, 518 U.S. 415, 427 (1996)). Thus, Puerto Rico law controls the interpretation of tortious interference with contractual relations claim and the defamation claim. *See* <u>Baum-Holland v. Hilton El Con Mgmt., LLC</u>, 964 F.3d 77, 87 (1st Cir. 2020) (applying Puerto Rico substantive law in its diversity case).

A.   <u>Tortious Interference with Contractual Relationships</u>

Puerto Rico's general tort statute, Article 1536 of the 2020 Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 10801 ("Article 1536"), grounds this claim. To prevail on a tortious interference suit, Mr. Horgan and Mr. Bente must show: "(1) existence of a contract between two or more parties; (2) an act of interference with that contract by a third-party defendant; (3) said act must have been done with "fault" on [Ms. Cirino's] part; (4) damage to the [Defendants]; and (5) a causal nexus between the tortious act and the injury." <u>Puma Energy Caribe, LLC v. Riollano-Caceres</u>, No. 14-CV-1790-JAG, 2017 WL 11607783, at *14 (D.P.R. Dec. 14, 2017) (*citing* <u>New Comm Wireless Servs., Inc. v. SprintCom, Inc.</u>, 287

Civil No. 25-1097 (GMM)
Page -26-

F.3d 1, 9 (1st Cir. 2002)). "Fault" here is understood to mean
that Ms. Cirino must have "intended to interfere with the contract,
knowing that this interference would cause injury to
[Defendants]." New Comm Wireless, 287 F.3d at 10 (*citing* Jusino
Figueroa v. Walgreens of San Patricio Inc., 155 D.P.R. 560, 2001
WL 1414693, at *5 (2001)).

After reviewing Defendants' *Amended Answer* alongside
Plaintiff's *Motion to Dismiss*, the Court finds that Defendants
failed to sufficiently plead the first two elements to survive a
12(b)(6) review.

 i. Existence of a Contract

First, the Supreme Court of Puerto Rico has stated that to
establish the first element of a tortious interference claim a
party must demonstrate that the contract exists and contains a
fixed time period. A.M. Capen's. Co., Inc. v. Am. Trading & Prod.
Corp., 202 F. 33d 469, 474 (1 st Cir. 2000); *see also* Dolphin
Int'l. of P.R. v. Ryder Truck Lines, 127 P.R. Dec. 869, 882-83
(P.R. Jan. 31, 1991) (holding that at-will contracts lacking an
expiration date cannot create a tortious interference cause of
action); Tilsor v. Oracle Caribbean, Inc., No. 19-CV-1875-PAD,
2022 WL 20814952 at *11 (D.P.R. Sep. 30, 2022) (*citing* R.R. Isla
Verde Hotel Corp. v. Howard Johnson Int'l, Inc., 121 F. App'x 870,
871 (1st Cir. 2005)) ("Existence of a contract for a fixed period
of time is indispensable."). "If what is affected is a profitable

Civil No. 25-1097 (GMM)
Page -27-

financial relationship in the absence of a contract the [tortious interference] action does not lie." Tilsor, 2022 WL 20814952, at *11.

Mr. Horgan and Mr. Bente fall short of satisfying this element. In their *Amended Answer*, Defendants allege Ms. Cirino committed tortious interference because she "obstructed Pilgrim House's entertainment programming[] by besmirching Horgan's reputation, and causing more than 12 artists who had agreed to perform at the Pilgrim House to break their commitments." (Docket No. 22 at 33). Defendants go on to specify that Pilgrim House "secured contracts with several high-demand performers for the upcoming 2025 season." (Id. at 34). These statements suffer from vagueness. It is not clear which performers were contracted, and if those were the performers Ms. Cirino allegedly interacted with. Moreover, and more critically, Defendants do not specify whether the contract is fixed to the "upcoming 2025 season" or only inclusive of it; in other words, it is unclear whether the alleged contract is open-ended.

This lack of specificity is fatal.[2] For the Court to hold Ms. Cirino to account for allegedly interfering with the contracts of

---

[2] Defendants attempt to amend their initial pleadings by supplying much more detail about their negotiations with Miss Conception and Peaches Christ in their *Opposition to MTD* (Docket No. 36 at 9 n.2) and attach as an exhibit the unsigned contract between Pilgrim House and Miss Conception. (Docket No. 36-1). This information, however, will not be

Civil No. 25-1097 (GMM)
Page -28-

twelve performers, as Defendants request, the Court needs to know
plausibly satisfy the first element that there indeed existed
contracts containing fixed time periods between Pilgrim House and
the performers subject to Ms. Cirino's alleged obstruction. Even
accepting all the information provided by Defendants in their
*Amended Answer* as true, as this Court must at this stage of review,
Defendants pleading fail to meet the first element's requirements.

   ii. <u>Interference with Contract by a Third Party</u>

   As to the second element, Defendants must establish that Ms.
Cirino was a third party to the contract that allegedly existed
between Pilgrim House and performers. Yet an affiliate or
subsidiary of a company, as well as the agents of a company, that
is, its representatives, are not third parties for the purposes of
a tortious interference action. <u>Jusino Figueroa v. Walgreens of
San Patricio Inc.</u>, 155 D.P.R. 560, 587-88 (2001)[3] (holding that an

─────────────

considered by the Court, as it is well-settled that a plaintiff may not
amend a complaint through arguments in an opposition brief. *See* <u>Díaz-
Zayas v. Mun. of Guaynabo</u>, 600 F. Supp. 3d 184, 195 (D.P.R. 2022) ("It
is axiomatic that the complaint may not be amended by the briefs in
opposition to a motion to dismiss.") (*quoting* <u>Velazquez-Ortiz v.
F.D.I.C.</u>, 2012 WL 1345174, at *6 (D.P.R. 2012)). Defendants'
disagreements with reliance with <u>Diaz-Zayas</u> in their *Surreply* is
inapposite because the case is being used not for its central holding
but for its articulation of a standard of review. *See* (Docket No. 56 at
3-4). Thus, the Court need not consider these after-the-fact allegations
in determining the sufficiency of the *Amended Answer* under Rule 12(b)(6).
Even if the Court were to consider it, the footnote only further affirms
that these two performers never signed any contract.
[3] As no official translation of this Spanish language opinion is available, all
quotations are from and to the certified translation submitted by the parties.
*See* (Docket No. 34-1).

Civil No. 25-1097 (GMM)
Page -29-

agent of Walgreens who was not the General Manager but was someone who had been involved with making contracts for the business before was not a third party that could tortiously interfere with the contract in question). Indeed, these agents are understood to be "an alter ego of the company" for tortious interference purposes. *See* id.

As conceded by Defendants in their *Amended Answer* (Docket No. 22) and *Defendants' SUMF* (Docket No. 53-1), Ms. Cirino is a partner of Pilgrim House with a percentage of ownership equal to that of Mr. Horgan and Mr. Bente. Moreover, as both parties again concede, Ms. Cirino has made agreements concerning Pilgrim House in the past, such as the *Advance Agreement*. Even if Ms. Cirino is not the "General Manager" of Pilgrim House who oversees the day-to-day operations as Mr. Horgan alleges he does, she has had sufficient prior dealings with Pilgrim House's contracts as an equal owner of the hotel that allows this Court to conclude she functioned as an agent or co-principal of Pilgrim House's behalf and is an "alter ego" of Pilgrim House and is not a third party for tortious interference purposes. Therefore Ms. Cirino cannot be considered a third party to any contracts that between Pilgrim House and the performers.

As such, for failure to satisfy the elements for tortious interference with contractual relationships, the Court must dismiss this claim.

Civil No. 25-1097 (GMM)
Page -30-

B. Defamation

Under Puerto Rico law, claims for defamation stem from three sources: "(1) Section 8 of Article II of the Constitution of the Commonwealth of Puerto Rico [("Section 8")]; (2) the Libel and Slander Act of 1902, P.R. Laws Ann. tit. 32 §§ 3141-49 [("Act of 1902")]; [and] (3) Puerto Rico's General Tort Statute, Article 1536 []." Sarmonpal v. Blanco, No. 22-CV-1619-JAG, 2024 WL 1829258, at *6 (D.P.R. Feb. 7, 2024) (citing Aponte v. Calderón, 284 F.3d 184, 197 (1st Cir. 2002)).

Each source bestows different protections. Section 8 guarantees that "[e]very person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life." Puerto Rico Const. Art. II § 8. This constitutional provision supplies "a right of action without enabling legislation." Aponte, 284 F.3d at 197. (citing Porto v. Bentley P.R., Inc., 132 D.P.R. 331, 343 (P.R. 1992)). Legislation supplements this constitutional language. The Libel and Slander Act of 1902 encompasses both libel and slander. P.R. Laws Ann. tit. 32 § 3141, et seq. Relevant here, slander is defined as "a false and unprivileged publication other than libel, which imputes to any person the commission of a crime, or tends directly to injure him in respect to his office, profession, trade or business, or which by natural consequences causes actual damage." Id. § 3143.

Civil No. 25-1097 (GMM)
Page -31-

And Article 1536, as state above, grounds a claimant's ability to bring a tort action for defamation.

These laws are cabined by the First Amendment's free speech provisions. See El Vocero de P.R. (Caribbean Intern. News Corp.) v. Puerto Rico, 508 U.S. 147, 148 n. 1 (1993) (applying the First Amendment's free speech clause to Puerto Rico). Not all speech, however, is protected; only "statements that cannot reasonably be interpreted as stating actual facts about an individual" fall under its protections. Diaz, 2020 WL 1042041, at *3 (*quoting* Milkovich v. Lorain J. Co., 497 U.S. 1, 20 (1990)) (citation modified). Examples such as "imaginative expression," "loose, figurative, or hyperbolic language," Milkovich, 497 U.S. at 20-21, and "mere obscenities and verbal abuses that are not objectively verifiable and cannot be interpreted as factual" fall into this category and are not considered defamatory. Diaz, 2020 WL 1042041, at *3 (*citing* Beverly Enters., Inc. v. Trump, 182 F.3d 183, 187-88 (3d Cir. 1999)

Pursuant to Puerto Rico laws, "'a private plaintiff asserting a defamation claim against a private defendant," as Defendants state is the case here, "must show that the [opposing party] (1) made a false statement, (2) in a negligent manner, (3) causing actual damage to the plaintiff.'" Rojas-Buscaglia v. Taburno-Vasarhelyi, 199 F. Supp. 3d 520, 536 (D.P.R. 2016), *aff'd sub nom.* Rojas-Buscaglia v. Taburno-Vasarhelyi, 897 F.3d 15 (1st Cir. 2018) (*quoting* Baltodano v. Merck, Sharp & Dohme (I.A.) Corp., 637 F.3d

Civil No. 25-1097 (GMM)
Page -32-

38, 43 (1st Cir. 2011)). The specific defamatory language used
must indeed be false; its veracity is a valid defense. Ayala-
Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 98 (1st Cir. 1996);
Villanueva v. Hernández Class, 128 D.P.R. 618, 643 (P.R. 1991).
Alongside these three elements, when a claim for defamation is
brought under Article 1536, a causal relationship between the
defamatory statements and the damages the defamed individual
suffered must be proven. See Rivera v. DHL Glob. Forwarding, 536
F. Supp. 2d 148, 157 (D.P.R. 2008).

Claims for defamation must satisfactorily plead these
elements. "[C]ountless district courts," including this Court
under the laws of Puerto Rico, "have found that the requirements
of Rule 8 have not been met in cases where libel and slander claims
failed to allege the substance of the statements and/or the time
and place in which they were made." Hawkins v. Kiely, 250 F.R.D.
73, 75 (D. Me. 2008) (citing four other district court decisions
finding imprecise pleading of what the defamatory statements were
led to dismissal); see also Ayala-Gerena, 95 F.3d at 98 (dismissing
under Puerto Rico defamation laws for the same imprecise
pleadings); Feliciano-Monroig v. AT&T Mobility P.R., Inc., No. 16-
CV-2810-JAG, 2019 WL 1486868, at *10 (D.P.R. Mar. 31, 2019) (same).

Key to this analysis, therefore, are the actual, specific
"false statements" allegedly communicated by Ms. Cirino. Rojas-
Buscaglia, 199 F. Supp. 3d at 536. The Amended Answer supplies

three potential leads for what specific defamatory language Ms. Cirino may have said.

First, "statements such as 'Ken [Mr. Horgan] does not own Pilgrim House' and 'authorities will arrest him soon'" were "communicat[ed] . . . "to Management, Employees, Contractors, and the public via Lyn Plummer," which led Defendants to conclude that "Cirino has falsely accused Horgan of tax evasion, embezzlement, and fraud." (Docket No. 22 ¶¶ 116, 131). Here, the specific alleged defamatory statements – which were made and spoken aloud by Lyn Plummer - are that: 1) Mr. Horgan does not own Pilgrim House; and 2) that he will be arrested soon. (Id.).

Second, the *Amended Answer* asserts that "Cirino called Pilgrim House [Operations Manager] Kevin Street in late fall of 2024 ask [sic] him whether Horgan was stealing from Pilgrim House and asked whether there was a second set of accounting books showing Money In and Money Out." (Id. ¶ 120). Here, the alleged defamatory statements are two questions Ms. Cirino made at some period of time in fall 2024 regarding accounting and potential pilfering by Mr. Horgan. *See* (id.).

Third, the *Amended Answer* also states that "[t]he performers informed [another Pilgrim House employee] that Cirino had intimidated them and disseminated negative information about Horgan and Pilgrim House to discourage them from performing there."

Civil No. 25-1097 (GMM)
Page -34-

(Id. ¶¶ 124). No specific defamatory statements are identified here.

Mr. Horgan and Mr. Bente gesture broadly to this constellation of statements to say Ms. Cirino "intentionally besmirch[ed] Horgan's reputation, with the specific intent to cause more than 12 artists who had agreed to perform at the Pilgrim House entertainment venue to break their commitments," (id. ¶ 117), which has caused them damages "that, at this time, are difficult to calculate, but are estimated to surpass $250,000." (Id. ¶ 132).

The Court disagrees.

Consider again the elements for defamation. Mr. Horgan and Mr. Bente needed to show in their *Amended Answer* that Ms. Cirino communicated a false statement. This cuts out the first potential lead on communication grounds, because Lyn Plummer was the speaker, not Ms. Cirino. Refuse & Env't Sys., Inc. v. Indus. Servs. of Am., Inc., 932 F.2d 37, 40 (1st Cir. 1991) ("[I]t seems beyond cavil that in order for a [party] to be found individually liable for slander, the [party] must have personally made a slanderous statement about the [other party].").

This element does away with the second lead as well, as a question is not a defamatory statement because it does not assert an objectively verifiable fact. *See* Diaz, 2020 WL 1042041, at *3; Villanueva, 128 D.P.R. at 643; Beverly Enters., 182 F.3d at 187-88.

Lastly, this first element also nixes the third potential lead, because no specific words spoken by Ms. Cirino were identified by Defendants – only that they were negative and discouraging in tone. *See* (id. ¶ 124). As the First Circuit has held, "unadorned, the-defendant-unlawfully-harmed-me accusations" – such as Ms. Cirino broadly said negative things about Defendants - are insufficient to survive a 12(b)(6) review. Haley v. City of Boston, 677 F. Supp. 2d 379, 385 (D. Mass. 2009) (*quoting* Iqbal, 556 U.S. at 678); *see also* Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011) (quoting same); Roebuck v. Dothan Sec. Inc., 515 F. App'x 275, 280 (5th Cir. 2013) (concluding allegations that defendant "in bad faith maligned, negligently misrepresented, defamed, defrauded and slandered plaintiff extremely and outrageously" were insufficient to survive 12(b)(6) review).

On top of this, none of these statements as pled ever mention Mr. Bente, so it is difficult for the Court to discern how any of these potential leads could be causally tied to any specific damages he suffered. *See, e.g.*, Sánchez-Sifonte v. Fonseca, No. 22-CV-1444-RAM, 2023 WL 5753677, at *5 (D.P.R. 2023) (*citing* Santilli v. Van Erp, 2018 WL 2172554, at *5 n.6 (M.D. Fla. 2018), *report and recommendation adopted*, 2018 WL 2152095 (M.D. Fla. 2018) (finding that the allegedly defamatory statements were not aimed at one of the plaintiffs); Cate St. Cap. Inc. v. Indus. Intel.

Inc., No. 14-CV-00200-JCN, 2015 WL 12564165, at *7 n.15 (D. Me.
Oct. 28, 2015) (explaining that "an action for defamation 'is
personal to the plaintiff and cannot be founded on defamation of
another'") (*quoting* Prosser & Keaton, Torts § 111 at 778 n.48 (5th
ed. 1984)); Restatement (Second) of Torts § 564 (1977) (explaining
that a defamatory statement concerns the person to whom the reader
or recipient reasonably understands the statement relates).

　　　Taken together, the Court must also dismiss Defendants'
defamation claim under Rule 12(b)(6).

## C. Attorneys' Fees

　　　"Generally speaking, a request for attorneys' fees is not an
independent cause of action, but is rather a remedy that the Court
may award in its discretion." New England Teamsters Sav. & Inv.
Plan v. First Student, Inc., No. 24-CV-186-SE, 2025 WL 2523645, at
*4 (D.N.H. Sep. 2, 2025) (*quoting* Steve C. v. Blue Cross & Blue
Shield of Mass., Inc., 450 F. Supp. 3d 48, 61 (D. Mass. 2020));
*see also* Sun Commodities, Inc. v. Island Fresh de Puerto Rico,
Inc., No. 20-CV-1236-GMM, 2024 WL 2300708, at *10 (D.P.R. May 21,
2024) (declining to reach an attorneys' fees claim when the
substantive claims fall).

　　　Therefore, the Court dismisses Defendants' standalone claim
for attorneys' fees and costs.

D. <u>Rule 12(b)(7)</u>

As all of Defendants' counterclaims against Plaintiff have been dismissed, the Court does not reach the parties' Rule 12(b)(7) arguments.

In sum, this Court **GRANTS** Plaintiffs' *Motion to Dismiss*.

### V.   UNCONTESTED FACTS AS TO THE PARTIAL SUMMARY JUDGMENT

The Court now turns to the final motion before it: partial summary judgment. To evaluate the parties' claims, the Court examined *Plaintiff's SUMF* (Docket No. 50); Ms. Cirino's *Sworn Statement* (Docket No. 50-1); and the exhibits accompanying *Plaintiff's SUMF*, including the *Partnership Agreement* (Docket No. 50-2), the *Operating Agreement* (Docket No. 50-3), the *Agreement Among Maria Cirino, Ken Horgan and Scotte Bente* (Docket No. 50-4), *Amendment Number One to Agreement Among Maria Cirino, Ken Hor[g]an and Scott Bente* (Docket No. 50-5), the first *Demand Letter* (Docket No. 50-6), and the *Second Demand Letter* (Docket No. 50-7). The Court has also reviewed *Defendants' SUMF* (Docket No. 53-1), along with Mr. Horgan's *Declaration Under Penalty of Perjury of Kenneth [Hor]gan in Support of Opposition to Ex Parte Motion for Prejudgment Attachment*. (Docket Nos. 14-1, 53-3). After crediting only material facts supported by admissible and accurate record citations, the Court finds the following material facts are not in dispute:

1.   Plaintiff, Ms. Cirino, is a resident of Dorado, Puerto Rico. (Docket Nos. 1 ¶ 2; 8-1 at 1; 50 ¶ 1; 53-1 at 8).

2.   Mr. Horgan is a resident of the state of Massachusetts. (Docket Nos. 22 at 2, 20; 50 ¶ 2; 53-1 at 9).

3.   Mr. Bente is a resident of the state of Florida. (Docket Nos. 22 at 20; 50 ¶ 3; 53-1 at 9).

4.   Mr. Horgan and Mr. Bente are married. (Docket Nos. 22 at 20; 50 ¶ 4; 53-1 at 9).

5.   On February 17 and 18, 2017, Pilgrim House, LLC and 336R Commercial Street, LLC, executed a Purchase and Sale Agreement and an *Asset Purchase and Sale Agreement* with Pilgrim Heights, LLC, The Chad, LLC, and The Villa, LLC for the purchase of the real property and business formerly known as the Sage Inn and Lounge located at Unit 1, The Pilgrim House Condominium, 336 Commercial Street, Provincetown, MA 02657 ("Pilgrim House Hotel") for $2,650,000. (Docket Nos. 50 ¶ 5; 50-1 ¶ 2; 50-2 at 5; 53-1 ¶ 5).

6.   On February 18, 2017, Ms. Cirino, Ms. Barbeau, Mr. Horgan, and Mr. Bente entered into a *Partnership Agreement* establishing a partnership known as "The Pilgrim House" effective on February 6, 2017. (Docket Nos. 50 ¶ 6; 50-2 at 1, 4; 53-1 ¶ 6).

7.   Pursuant to Section II of the *Partnership Agreement*, the Partnership's primary purpose was "to operate [the] 19 room hotel, lounges, and event space" known as the Pilgrim House Hotel. (Docket Nos. 22 at 2; 50 ¶ 7; 50-2 at 1, 4; 53-1 ¶ 7).

8.   Section IV of the *Partnership Agreement*, titled "Interest and Authority," granted each Partner – Mr. Bente, Mr. Horgan, Ms. Barbeau, and Ms. Cirino – a 25% ownership interest in the Partnership. (Docket Nos. 22 at 2; 50 ¶ 8; 50-2 at 2; 53-1 ¶ 8).

9.   The Pilgrim House, LLC is a limited liability company formed pursuant to the laws of the state of Massachusetts. (Docket Nos. 50 ¶ 9; 50-2 at 2; 53-1 ¶ 9).

10. On April 18, 2017, the parties executed an *Operating Agreement* for the Pilgrim House, LLC. (Docket Nos. 50 ¶ 10; 50-2 at 2; 53-1 ¶ 9).

11. Section 2.1 of Article II of the *Operating Agreement* provides the following:

> 2.1 The Company shall be Manager-managed. The Manager need not be a Member. The number of Managers is hereby initially fixed at four (4), and the person identified as Manager on Exhibit A, which is attached hereto and made a part hereof, are currently serving as Manager. The manager shall be solely responsible for the management of the Company's business. They shall possess all rights and powers generally conferred by the Act and all rights and powers that are necessary, advisable or consistent in connection therewith and with the provisions of this Agreement. The Manager shall also be vested with all specific rights and powers required for or appropriate to the management, conduct or operation of the business of the Company. Except for distributions made to Members as set forth in this Agreement and any fees for specific management services, the Managers shall receive no compensation from the Company for their actions taken as Managers pursuant to this Agreement.

(Docket Nos. 50 ¶ 11; 50-3 at 2; 53-1 ¶ 11).

12. Exhibit A to the *Operating Agreement* identifies the members of Pilgrim House, LLC as Mr. Bente, Ms. Cirino, Ms. Barbeau, and Mr. Horgan, each holding a 25% membership interest. (Docket Nos. 50 ¶ 12; 50-3 at 17; 53-1 ¶ 12).

13. Approximately five (5) years later, on February 27, 2023, the parties – Ms. Cirino, Mr. Horgan, and Mr. Bente – executed the *Agreement Among Maria Cirino, Ken Horgan, and Scott Bente* (the "*Advance Agreement*"). (Docket Nos. 50 ¶ 13; 50-4 at 1; 53-1 ¶ 13).

14. Mr. Horgan and Mr. Bente appeared as the "Borrowers" in the *Advance Agreement*, and Ms. Cirino is identified as the "Lender." (Docket Nos. 50 ¶ 14; 50-4 at 1; 53-1 ¶ 14).

15. The Advance Agreement puts forth that, "in October 2022, Cirino, as Lender, lent the Borrowers [Mr. Horgan and Mr. Bente] $125,000 (the "October Loan") pursuant to a promissory note in relation to Borrower's business activities in Palm Springs, CA at the Hotel Zoso (the ["]Zoso Lease"). (Docket Nos. 50 ¶ 15; 50-4 at 1; 53-1 ¶ 15).

16. The *Advance Agreement* further states in the Recitals that "the Borrowers [were] in need of further funds to continue the Zoso Lease," that "the Borrowers [] bec[a]me delinquent with respect to certain payments due to Cirino and parties affiliated with Cirino with respect to the Pilgrim House Hotel in Provincetown, MA," and that "the Borrowers [were] in a partnership with Cirino or a party affiliated with Cirino in relation to a property referred to as the Amanda Lane property." (Docket Nos. 50 ¶ 16; 50-4 at 1; 53-1 ¶ 16).

17. The *Advance Agreement* also makes clear that, "in order for Cirino to consider advancing more funds to Borrowers, Cirino desires to set forth the terms upon which additional funds will be advanced to resolve any issues with the Borrowers with respect to the Pilgrim House Hotel, the Amanda Lane property, and the loan regarding the Zoso Lease," and "the Borrowers desire to agree to such terms set forth herein as an inducement to Cirino to advance the funds requested with respect to the Zoso Lease." (Docket Nos. 50 ¶ 17; 50-4 at 1; 53-1 ¶ 17).

18. The *Advance Agreement* sets forth the following terms and conditions governing the loan between the parties:

> 2. Cirino agrees to advance $200,000 (the "Advance") and loan $35,000 (the "Loan") to Borrowers subject to the terms of this Agreement (and any further agreements deemed necessary by Cirino's counsel to effectuate the terms of this Agreement).

3. The Advance will not need to be repaid to Cirino and the October Loan will be forgiven if the following conditions are met:

a. 75% of the amount received in relation to the Employee Retention Credit (the "ERC" amount) is wired to Cirino within 24 hours of receipt. It is anticipated that the ERC is $324,341.05. If the ERC Amount does not get paid to Cirino by August 31, 2023, then Cirino shall have the option to convert the Advance to a loan subject to the same terms as the Loan set forth herein.

b. Borrowers agree to reduce their ownership interest in Amanda Lane to 25% by transferring an ownership interest of 25% to Cirino (or as directed by Cirino). Borrowers agree that a subsequent document will be prepared effectuating this ownership change and they agree to execute such document. In addition, if the ERC Amount is not received by August 31, 2023, then the Borrowers agree to further reduce their ownership in Amanda Lane to 10% by transferring an additional ownership interest of 15% to Cirino (or as directed by Cirino).

c. Borrowers agree that with respect to Amanda Lane, the sales proceeds shall be reduced by development and rehab costs associated with the property, including but not limited to, any costs for design and architecture, legal, building, and landscaping. Further, the net sales proceeds shall be paid out proportionally

(Docket Nos. 50 ¶ 18; 50-4 at 1-2; 53-1 ¶ 18).

19. Under Section 4 of the *Advance Agreement*, Mr. Bente and Mr. Horgan agreed to the following language, of which the interpretation is contested: "[in] consideration of the Advance and the Loan, Borrowers agree that Cirino shall have full decision-making authority on the valuation, timing and strategy with respect to the sale of the Pilgrim House Hotel notwithstanding any agreement

to the contrary." (Docket Nos. 50 ¶ 19; 50-4 at 2; 53-1 ¶ 19).

20. The *Advance Agreement*, at Section 5 includes the following provision concerning overdue hotel payments, the interpretation of which is contested:

> Borrowers are currently past due on existing hotel payments and rents to Cirino (or the entities affiliated with Cirino). Borrowers agree that from this date forward existing hotel payments and rents will be paid timely. With respect to the past due amount, Borrowers agrees to bring those amounts current as soon as possible. In the event the past due amounts are not paid in full by October 31, 2023, then a 25% penalty shall accrue and compound every six (6) months until the amount is settled.

(Docket Nos. 50 ¶ 20; 50-4 at 2; 53-1 ¶ 20).

21. Section Six of the *Advance Agreement* addresses the loan's due date, interest rate, and consequences of nonpayment, stating, again of which the interpretation is contested:

> The Loan shall be due on December 31, 2023 and bear an interest at 10% per annum; provided, however, if the Loan is not paid in full by December 31, 2024, including any penalty rate of 15%; then the Borrowers agree to transfer 5% of their interest in the Pilgrim House Hotel to Cirino (or as directed by Cirino.)

(Docket Nos. 50 ¶ 21; 50-4 at 2; 53-1 ¶ 21).

22. On March 16, 2023, Ms. Cirino, Mr. Horgan, and Mr. Bente executed an Amendment Number One to the Agreement Among Maria Cirino, Ken Horgan and Scotte Bente (the "Amendment"), reducing the Loan amount from $35,000 to $20,000. (Docket Nos. 50 ¶ 22; 50-5 at 1; 53-1 ¶ 22).

23. In July 2023, the Pilgrim House Hotel received the Employment Retention Credit (ERC) payment of $335,722.63. The Defendants deposited a check for this amount. (Docket Nos. 22 ¶ 16; 50 ¶ 23; 50-1 ¶ 18; 50-6 at 1; 53-1 ¶ 23).

Civil No. 25-1097 (GMM)
Page -43-

24.  Mr. Horgan and Mr. Bente paid $228,219.71 of the ERC amount to Ms. Cirino, which represents a contested amount of the percentage owed to Ms. Cirino. (Docket Nos. 50 ¶ 24; 50-1 ¶ 18; 50-6 at 1; 53-1 ¶ 24).

25.  On January 23, 2025, Ms. Cirino, through counsel, sent a *Demand Letter* to Mr. Horgan and Mr. Bente to assert what she characterized as her right to exercise control over Pilgrim House Hotel's sale, in accordance with her interpretation of the *Advance Agreement*. This letter asked Defendants to cooperate with a potential sale and to provide access to the company's financial information and systems. (Docket Nos. 50 ¶ 27; 50-7; 53-1 ¶ 27).

26.  Defendants did not respond to the *Demand Letter*. (Docket Nos. 50 ¶ 28; 50-1 at 3; 53-1 ¶ 28).

27.  On February 5, 2023, Ms. Cirino, through counsel, sent Defendants a second demand letter requesting the payment of all sums she considered to be outstanding by February 13, 2025, and requested Defendants sign documents providing Ms. Cirino with the authority to execute any transaction she deemed appropriate concerning the sale of the Pilgrim House Hotel. (Docket Nos. 50 ¶ 29; 50-1 at 3; 50-6; 53-1 ¶ 29).

## VI.  PARTIAL SUMMARY JUDGMENT

Plaintiff requests this Court to answer two questions on partial summary judgment: 1) Ms. Cirino's right to "total dominion" over the sale of Pilgrim House; and 2) the transfer of five percent interest in Pilgrim House from Defendants to her. (Docket No. 51 at 9-10).

Before the merits, however, a threshold matter. Plaintiff requested this Court deem her *Motion for Partial Summary Judgment* unopposed because Defendants did not file a response by the required deadline. *See* (Docket No. 52). Indeed, this delay does

Civil No. 25-1097 (GMM)
Page -44-

entitle this Court to reach said conclusion. *See* Méndez, 900 F.2d at 6-7 (collecting cases across circuits that affirm a district court's authority to regulate its docket with discretion after parties fail to adhere to court-imposed deadlines). To be sure, "a district judge must often be firm in managing crowded dockets and demanding adherence to announced deadlines. . . . [P]arties should not be allowed casually to flout it or painlessly to escape the foreseeable consequences of noncompliance." Id.

That said, Plaintiff's *Motion that PSJ Be Deemed Unopposed* is **DENIED**. While Defendants' defiance of its deadlines is vehemently condemned – and will not be tolerated again – the Court recognizes that the benefit of a balanced argument at the partial summary judgment stage, given the weight of the motion, outweighs the one-day delay.

Even if the Court deemed the motion unopposed, this "does not mean . . . that summary judgment should automatically follow." Velez v. Awning Windows, Inc., 375 F.3d 35, 42 (1st Cir. 2004). The Court's duty "to test the undisputed facts in the crucible of the applicable law in order to ascertain whether judgment is warranted" persists in any setting – and perhaps even more stridently so when there's been no discovery. Id.

Plaintiff has "engaged in the unusual strategy of filing a motion for summary judgment before any discovery has been conducted. The First Circuit . . . has held that summary judgment

is inappropriate where parties have had insufficient opportunity to engage in discovery." Fid. Real Est. Partners V LLC v. Lembi, No. 06-CV-11141, 2006 WL 8458456, at *2 (D. Mass. Dec. 15, 2006) (*citing* Velez, 375 F.3d at 39); *see also* Bissereth v. United States, No. 21-CV-11068-ADB, 2023 WL 4373888, at *6 (D. Mass. July 6, 2023); Celotex Corp., 477 U.S. at 323 (noting summary judgment must follow "adequate time for discovery"). "Because no discovery has yet been taken in this case, the Court will not enter summary judgment on behalf of the plaintiff unless it is *exceedingly* clear that there are no genuine issues of material fact." Id. (emphasis added); *see also* Velez, 375 F.3d at 39.

Here, the Court notes that the parties have yet to engage in any form of discovery, nor even schedule a Rule 26(f) conference. In fact, the evidentiary scaffolding outside of the pleadings is quite scarce. It largely consists of the series of urgent informative motions Plaintiff submitted to this Court, (Docket Nos. 28, 32, 49), which Defendants have not opined on.

Urgent informative motions, however, cannot and do not supplant the Federal Rules of Civil Procedure. A few motions from one party are a far cry from the robust discovery processes federal district courts uphold.

With this in mind, and with an abundance of caution, this Court turns to the merits of Plaintiff's requests.

Civil No. 25-1097 (GMM)
Page -46-

Plaintiff requests this Court utilize its discretion under the Declaratory Judgment Act to affirm she has certain rights. The Declaratory Judgment Act provides that a court "may declare the rights and other legal relations of any interested party," 28 U.S.C. § 2201(a) (emphasis added), not that it must do so. This text has long been understood "to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 136 (2007) (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)); see also Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 95 n. 17 (1993); Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 494-96 (1942). Courts have routinely held it is "more consistent with the statute . . . to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." Wilton, 515 U.S. at 289.

Yet the paucity of "facts . . . within [the Court's] grasp" dictates much of this Court's rulings. For starters, consider the question of the Advance Agreement's validity. Defendants allege that the Advance Agreement should be nullified or revised pursuant to Puerto Rico's Civil Code. (Docket No. 22 at 18-19). According to Defendants, the Advance Agreement is not valid because it was

Civil No. 25-1097 (GMM)
Page -47-

made with the purpose of taking advantage of Defendants' economic
need. *See* (id.); *see also* (Docket No. 53 at 18-19).

Take Defendants' Article 1258 assertions.[4] It governs the
validity of contracts that are rooted in injury resulting from a
disproportionate economic advantage. P.R. Laws. Ann. tit. 31 §
9841. Article 1258 allows for the nullification or revision of
contracts procured through economic exploitation, particularly
when one party takes advantage of the economic dependence of
another to impose disproportionate obligations. Id.

Defendants, however, fail to meet the required pleading bar.
Rather, Mr. Horgan and Mr. Bente offer only cursory and conclusory
descriptions of Ms. Cirino's fraudulent conduct related to the
*Advance Agreement* that fails to provide this Court enough
information to rule in their favor. *See* (Docket No. 22 at 18-19)
(claiming illicit and fraudulent behavior because the contract "is
the result of a brazen attempt by the Plaintiff to maliciously
take advantage of the need and economic dependence of the
Defendants and seeks to obtain a disproportionate and unjustified
windfall"); (id. at 29-34) (failing to describe Defendants'

---

[4] Defendants also challenge the *Advance Agreement*'s validity under Article
1328, which regulate maximum allowable interest rates. P.R. Laws Ann.
tit. 31 § 10085. (Docket No. 22 at 18-19). But since deciding this
question would only invalidate the interest clause, not the contract as
a whole - as Article 1328 itself says - the Court need not address it
at this time to properly consider the *Motion for Partial Summary Judgment*
before it. *See* id.

economic challenges); (Docket No. 53 at 9-14) (failing to describe circumstances surrounding the *Advance Agreement*'s signing).

At times, Defendants even contradict the foundation of their allegations: that they or Pilgrim House were facing economic challenges which Ms. Cirino took advantage of. *See* (Docket No. 22 at 30) ("Despite these shortcomings, the growth and success of the hotel business over the last seven years outpaced all plans, industry norms and local competitors.").

In light of the fact that parties made an *Amendment* to the *Advance Agreement* and continued to rely on it for years later, as uncontested in the *Plaintiff's SUMF* and *Defendants' SUMF*, see (Docket Nos. 50, 53-1), and considering the absent or contradictory information recounted above, Defendants fail to raise a successful Article 1258 defense that would bar this Court's reliance on the *Advance Agreement* for partial summary judgment purposes.

Notwithstanding that validity of the *Advance Agreement*, assuming arguendo it is valid would lead to a similar result: the Court would still deny summary judgment as to Ms. Cirino's requests because the terms of the contract are ambiguous.

As this Court sits in diversity, Puerto Rico's Civil Code again provides some overarching principles for contract interpretation. *See* P.R. Laws. Ann. tit. 31 § 9757. "A contract's text serves as the starting point for that inquiry." Holsum de P.R., Inc. v. ITW Food Equip. Grp. LLC, 116 F.4th 59, 67 (1st Cir.

2024). "If the text is clear, then courts should adhere to the text absent unusual circumstances." Id. Contract terms are clear when they are "lucid enough to be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation." Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 53 (1st Cir. 2010). Where a contract is ambiguous or silent on an issue, however, the intent of the parties at the time of contracting controls. Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc., 96 F.3d 10, 16 (1st Cir. 1996); Marina Indus., Inc. v. Brown Boveri Corp., 114 D.P.R. 64, 69–70 (P.R. 1983). Determination of the parties' intentions requires an examination of evidence surrounding the contract's inception, including "the occasion, the circumstances, the persons involved, and the agreement they intended to negotiate." Ramirez, Segal & Latimer v. Rojo Rigual, 123 D.P.R. 161, 174 (1989).

As for the Court's role, "while the threshold question of whether the contract was ambiguous 'present[s] a question of law for the judge,' the evaluation of 'extrinsic evidence relevant to the interpretation' of the contract present[s] questions of fact that preclude[] summary judgment." Pérez-Pérez v. Hosp. Episcopal San Lucas, Inc., 113 F.4th 1, 7 (1st Cir. 2024) (quoting Torres Vargas v. Santiago Cummings, 149 F.3d 29, 33 (1st Cir. 1998)).

Civil No. 25-1097 (GMM)
Page -50-

Without the benefit of a fuller evidentiary record, the *Advance Agreement* contains ambiguities that prevent the Court from granting summary judgment. The *Advance Agreement* states that Defendants agree that Ms. Cirino "shall have full decision-making authority on the valuation, timing and strategy with respect to the sale of the Pilgrim House Hotel notwithstanding any agreement to the contrary." (Docket Nos. 50 at 4-5 ¶¶ 16-22; 53-1 at 6-8 ¶¶ 16-22). This statement, however, is ambiguous. "Full decision-making authority" suggests totality over the sale of Pilgrim House, but the narrowing to "valuation, timing and strategy" might exclude certain aspects of the sale. In particular, the word "strategy" could theoretically encompass final execution of the sale, or it could be limited to just pre-sale coordination. The intent of the parties, therefore, is key to the interpretation of this term. This question of fact genuinely in dispute – answerable only after the gathering of relevant extrinsic evidence – is one reserved for the jury.

The same goes for Ms. Cirino's second request: it too suffers from a paucity of factual material available to overcome the parties' genuine disputes. The *Advance Agreement* stipulates that if certain conditions are not met, the Advance would be converted into a loan; and if the loan was not paid in full by December 31, 2024, then Defendants "agree to transfer 5% of their interest in the Pilgrim House Hotel to Cirino (or as directed by Cirino)."

Civil No. 25-1097 (GMM)
Page -51-

(Docket Nos. 50 at 5 ¶ 21; 53-1 at 7-8 ¶ 21). But one of the conditions triggering the transfer was whether "75% of the amount received in relations to the Employee Retention Credit [("ERC")] [was] wired to Cirino within 24 hours of receipt." (Docket Nos. 50 at 4-5 ¶¶ 16-22; 53-1 at 6-8 ¶¶ 16-22). Parties dispute whether this was satisfied. Defendants allege the parties understood that it was to be seventy-five percent of the net, not gross, ERC; Plaintiff argues the reverse. (Docket Nos. 1 at 8-11; 22 at 6 ¶ 17). The contract's terms on their own are silent as to whether the agreement was to net or gross returns. As such, this too must be reserved for the jury.

## V.    CONCLUSION

For the reasons explained above, the Court **GRANTS** Plaintiff's *Motion to Dismiss*, **DENIES** *Defendants' Motion to Strike*, **NOTES** Plaintiff's *Third Urgent Informative Motion*, **DENIES** Plaintiff's *Motion for Partial Summary Judgment*, **DENIES** Plaintiffs' *Motion Requesting PSJ Deemed Unopposed*; and **DENIES** *Plaintiff's Motion to Strike*.


IT IS SO ORDERED.

In San Juan, Puerto Rico, on January 14, 2026.


<u>s/Gina R. Méndez-Miró</u>
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE